## JOHNSTON v. WOODBURY.

(Circuit Court, N. D. California. August 7, 1899.)

No. 11,935.

1. PATENTS—INVENTION—ORE CONCENTRATORS.

In ore concentrators of the type having an inclined endless belt, carried by, and having a longitudinal movement upon, a frame to which a lateral movement is imparted, it was but a slight and formal advance in the art, involving no patentable invention, to construct a machine with the supporting strips always at a slight inclination from the vertical, and capable of adjustment to change the inclination until the even distribution of the

pulp over the belt surface was secured, in place of an old machine having vertical supports susceptible of adjustment to the desired inclination.

2. SAME.

The Johnston patent, No. 490,849, for an improvement in ore concentrators, is void, in view of the prior state of the art, for want of patentable invention.

This was a suit in equity by George Johnston against George E. Woodbury for alleged infringement of a patent for an improvement in ore concentrators.

John H. Miller, for complainant.

Wheaton & Kalloch, for respondent.

MORROW, Circuit Judge. This is a suit for the infringement of letters patent of the United States No. 490,849, granted to the complainant, George Johnston, January 31, 1893, for an ore concentrator. Complainant claims to be the sole owner of said letters patent, and of all rights and privileges by them granted covering the United States and its territories, and alleges that great pecuniary benefit and advantage have accrued to him and his licensees from the exclusive possession and enjoyment of the privileges of said letters patent; that the respondent, George E. Woodbury, is making, using, and selling ore concentrators which embody plaintiff's patented invention, and are infringements thereof; that complainant has suffered great and irreparable injury by reason of said infringements, and therefore asks for an injunction restraining the respondent and his agents and employés from further acts of infringement. The class of ore concentrators to which complainant's invention, as contained in letters patent No. 490,849, relates, is of the type having an inclined endless belt, carried by, and having a longitudinal movement upon, a frame to which a lateral movement is imparted. Finely-crushed sulphurets, mixed with water until in the condition of a watery pulp, are fed to the surface of the belt, and carried up the incline to a point where a sufficient supply of water is met. The combined lateral and longitudinal movement of the belt and the agitation of the pulp and water thus produced cause a separation of the pulp, the sulphurets and heavier precious particles sinking to and contacting with the surface of the belt, while the water and waste material run down the incline, and escape at the lower end of the concentrator. The sulphurets are carried with the belt up the incline, around the guide roller at its upper end, and down through a water tank below, where they are washed off and deposited. Complainant specifies his improvement to consist in a novel manner of connecting the belt frame carrying the moving belt to the stationary main frame, so as to produce an oscillatory motion of the former; also, in means for changing the degree of oscillation given to such frame, in a flexible connection for the shaft which gives the belt its "uphill" motion, whereby a rigid shaft is enabled to impart motion to gearing which is carried by and oscillated with the belt frame, and in the construction of the water box, or distributor. The accompanying drawings illustrate the mechanism, and are described by complainant as follows:

G. JOHNSTON.
ORE CONCENTRATOR.

No. 490,849.                    Patented Jan. 31, 1893.

Fig. 1.

Fig. 2.

Fig. 3.

Witnesses.

Inventor.
George Johnston.
by his Attorneys
Speas & Seely

(No Model.)                                    2 Sheets—Sheet 2.

G. JOHNSTON.
(ORE CONCENTRATOR.

No. 490,849.                    Patented Jan. 31, 1893.

Fig. 4.

Fig. 5.

Fig. 6.

Fig. 7.

Witnesses.

Inventor.
George Johnston
by his Attorneys.
Spear & Seely.

"Fig. 1 is a side elevation of my concentrator. Fig. 2 is a plan view, with the pulp and water boxes removed. Fig. 3 is a cross section on the line x, x of Fig. 1. Fig. 4 is a cross section to illustrate a modification in the manner of connecting the supporting links. Fig. 5 represents another modification. Fig. 6 is a cross section of the water box. Fig. 7 is a front elevation of the same. A represents a stationary supporting frame of any suitable construction, but shown here as consisting of longitudinal sills, a, a, uprights $a^1$, $a^1$, and transverse beams, $a^2$, $a^2$. B is the inclined oscillating belt frame composed of longitudinal side beams, b, b, connected by cross braces, $b^1$, $b^1$, and at the ends by the guide rollers, C, $C^1$, which are journaled in movable bearings, c, $c^1$, connected to the beams, b, b, and adjustable by means of screws, d, in order to tighten or loosen the ore belt, as may be required. A series of rollers, D, is journaled in the frame, B, over which, and around the rollers, C, $C^1$, passes the ore belt, E. There are some features in the construction of this belt which will be hereinafter described, but at this point it is sufficient to say that it is made of suitable flexible material, such as canvas, and may be provided with riffles on its surface, if desired. The water tank, F, is situated at one end of the main frame below the high end of the belt, and a guide roller, G, is journaled in hangers suspended from the belt frame, so that the roller will dip into the tank, and carry the belt with it. The belt, after leaving the tank, passes over another guide roller, H, which directs its course to the end roller, $C^1$. I have termed the lateral motion of the belt frame and belt an oscillatory motion, to distinguish it from the ordinary horizontal side shake, as well as from the movement produced by mounting the belt frame upon base rockers. The horizontal side shake is ordinarily produced by supporting or suspending the belt frame by vertical swinging rods, having a parallel motion, by means of which the surface of the belt maintains a constant horizontal plane as it shakes. I support or suspend my belt frame by links, I, which may be either rigid bars or wooden or metal springs. These links are pivoted to the main frame and to the belt frame, and are placed at an angle to one another (Fig. 3), so as to swing with a nonparallel motion. Either or both the pivot bearings for these links may be made adjustable, as shown at e, in order that the angle may be changed, and a greater or less variation from the horizontal plane be given the belt. In Fig. 3 I have shown these links as tending to converge downwardly. The effect of their side swing is to give the belt a swinging motion on an upward curve. But in Fig. 4 I have shown the links as tending to diverge downwardly, in which case the swing of the belt is on a downward curve. In other words, any one point on the surface of the belt moves in an arc, the direction of whose curvature relatively to the horizontal depends upon the convergence or divergence of the links, the amount of movement depending upon the angle at which the links are placed. The modification shown in Fig. 5 will be readily understood without detailed explanation. It consists simply in suspending the links from the upper part of the main frame, instead of supporting them upon its lower part. The angular relations of each pair of oppositely placed links are preserved, and the results obtained thereby are precisely similar to those just described.

"The movement of the upper part of the belt, when the links are arranged as shown in Fig. 3, is like that of a belt supported upon rockers working upon a base; but there are important advantages attending my construction. Where rockers are employed, the amount of transverse movement out of the horizontal given to the belt is constant and unchanging, because it depends upon the curvature of the rockers and the throw of the crank which operates them, and these are fixed at the time of construction. In my device, the adjustment of the links to different angles enables me to change, increase, or diminish the vertical movement of the belt within limits only fixed by the amount of slide that can be given at the pivotal connection of the links. Another advantage is that the amount of lateral swing on a curve, given to the roller suspended in the water tank, is very much greater than can be given such a roller by means of a rocker which works upon a pin at its contact point, where the motion is very slight. I am thus enabled to more thoroughly wash the belt in the tank, and more effectually to clear it from the sulphurets, some

of which might otherwise escape, and be washed off by the water flowing down the incline, and lost. The lateral oscillation of the belt frame is imparted by pitmen, J, connected to cranks, J¹, upon the driving shaft, K, which is journaled in bearings upon the stationary main frame. The pitmen extend across the belt, and are connected to the side beam of the belt frame. The shaft, K, which carries the driving pulley, L, is connected by a belt, M, running on two cone pulleys, N, O, to the counter shaft, P, which is the driving shaft for giving the longitudinal or 'uphill' movement to the belt. By using these cone pulleys, I am enabled, by shifting the belt, M, to change the speed of the shaft, P; and to accomplish this easily, and at the same time provide a belt tightener, I journal the shaft, P, in adjustable boxes, f (Fig. 1), by means of which the strain on the belt may be increased or diminished, as required. The shaft which gives the longitudinal motion to the belt is composed of two parts, P, P¹, the latter being journaled in a bearing in the belt frame, and having a worm, g, engaging with a screw gear wheel, h, on the journal of the driving roller, C. As the main part, P, of the shaft is journaled in the stationary main frame, while the part P¹, driving roller, and gearing must swing with the belt frame, a length of flexible shafting is interposed, and connected by couplings, i, i, to the two parts of the shaft, P. Any kind of flexible shafting may be used, but I prefer to employ a sufficiently stiff piece of wire rope or cable, which is well fitted for the purpose. Journaled in the sides of the belt frame, and alternating with the rollers, D, is a series of cones, Q, mounted upon short stub axles, j. (See Fig. 4.) The purpose of these is to turn up the edge of the belt as it passes over the rollers, D, and thus form a continuous flange to retain the pulp, and prevent overflow at the sides. Such cones have been used before for the same purpose, but have always been formed with the rollers, D. The result was that the difference in speed, produced by the difference between the diameters of the roller and the cone, would cause a drag on the belt, and its consequent wear. By making the cones separate and independent, both cones and rollers take simply the speed of the belt, and there is no unequal strain upon the latter. R represents the pulp box supported by standards, k, on the belt frame, and shown as provided with a series of orifices, l, in front, to distribute the pulp to the belt.

"I have heretofore referred to the belt as composed of canvas or like textile material. In order to preserve the belt from wear and the liability to decay, I boil or soak the canvas in a weak solution of glue, gelatine, or other animal fiber, which thoroughly permeates it. I then boil it in tan-bark water, which converts the gelatine into tannate of gelatine, and produces a textile fabric of great durability, and which also resists decay. S (see Figs. 6 and 7) represents the water box situated in front of the pulp box, and supported by an arm, l¹, connected to the main frame. The front board, m, of the box has its upper edge perforated a sufficient distance with a series of vertical holes or passages, n. At the bottom of this series, and intersecting the holes composing it, is a series of horizontal holes or passages, o, extending entirely through the board, so as to let water pass from the interior of the box. Each of the vertical holes, n, is provided with a screw or plug, p, by means of which the water may be entirely shut off from each passage, o, or allowed to run freely therefrom, and otherwise regulated. The water escaping from the holes, o, is conducted to the belt by vertical grooves or 'saw cuts,' q, extending down to the lower edge of the front board; the latter being beveled to a sharp edge, r, to prevent the water from finding its way backward along the bottom of the box. This is an exceedingly cheap, simple, and effective way of constructing the water box, and of regulating not only the amount of water supplied to the belt, but its proper distribution over the surface."

Claims 1 and 2, said by complainant to be infringed by respondent, are as follows:

"(1) In combination, a belt frame, means for sustaining the same, consisting of links, I, at its opposite sides, pivoted to the belt frame and the main frame, to have movement laterally thereof only, said links being permanently set at an angle to each other, and means for moving the frame on the angularly ar-

ranged supporting links, substantially as described. (2) In combination, a belt frame, means for supporting and directing the movement of the same, consisting of the links, I, having movement transversely of the frame only, said links being set permanently at an angle to each other, and being capable of adjustment to vary the said angle, and the means for moving the frame, substantially as described."

The respondent, in his amended answer, sets up the defenses of want of invention and anticipation, and denies the charge of infringement. In support of the defense of anticipation, reliance is made upon the following prior patents: No. 325,129, dated August 25, 1885, granted by the United States to E. W. Stephens, for improvements in ore concentrators, and No. 285,110, dated September 18, 1883, to John M. Adams and William F. Carter, for improvements in ore concentrators; also upon the printed pamphlets published and put in general circulation by the said Adams and Carter for the purpose of advertising and selling their patented machines under the name of the "Frue Concentrators." A list of mines is also set forth at which the said Frue concentrators are alleged to have been used prior to complainant's patent.

The primary question to be determined is the validity of complainant's patent. What is the essential idea or conception embodied therein? As stated in the specification, the improvements consist in a novel manner of connecting the belt frame carrying the moving belt to the stationary main frame, so as to produce an oscillatory motion of the former, and means for changing the degree of such oscillation. The method of operation is the following: The supporting strips pivotally connecting the belt frame with the stationary frame at the four corners are angularly inclined. Mechanism is provided for giving a lateral motion to the belt frame, and the surface of the belt is given an oscillatory motion by the swinging of the supporting strips, the degree of oscillation depending upon the divergence or convergence of the links or supporting strips. The state of the art at the time complainant applied for his patent discloses ore concentrators having a lateral movement of the belt frame, effected by various mechanical devices. The greatest reliance is placed by respondent upon the Carter and Adams patent as anticipating the patent in suit. The Frue Company now own the Carter and Adams patent, and all machines manufactured in accordance with that patent are commonly known as "Frue Concentrators." The accompanying drawings illustrate the device, and are explained as follows:

(Model.)    4 Sheets—Sheet 0

W. F. CARTER & J. M. ADAMS.

ORE CONCENTRATOR.

No. 285,110.    Patented Sept. 18, 1883.

Attest:

Walter Fowler.

N. L. Collamer.

Inventors:

Wm. F. Carter

Jno. M. Adams

by Dewey & Co

and A. N. Evans & Co Attys

(Model.)  4 Sheets—Sheet 2.

# W. F. CARTER & J. M. ADAMS.

## ORE CONCENTRATOR.

No. 285,110.  Patented Sept. 18, 1883.

Witnesses;
Gea H Chong
D H Krouse

Inventors
Wm F Carter
John M Adams
By Dewey & Co.
Attorneys

# W. F. CARTER & J. M. ADAMS.
## ORE CONCENTRATOR.

No. 285,110.                    Patented Sept. 18, 1883.

Fig. 6.

Fig. 4.

Fig. 5.

Attest                              Inventors;
                                Wm F. Carter
                                Jno. M. Adams
                            per attys  Dewey & Co

(Model.) 4 Sheets—Sheet 4.

# W. F. CARTER & J. M. ADAMS.
## ORE CONCENTRATOR.

No. 285,110. Patented Sept. 18, 1883.

*Fig. 9.*

*Attest;*

*Inventors;*
Wm. F. Carter
Jno. M. Adams.
by Dewey & Co
and A. H. Evans & Co.
*Attys.*

R. K. Evans

"Fig. 1 is a side elevation of our improved concentrator. Fig. 2 is a vertical longitudinal section of the same. Fig. 3 is an enlarged view of the principal operating devices. Fig. 4 is an enlarged detail, illustrating the yielding supports which sustain the apron frame, and the fastenings of said supports. Fig. 5 is an enlarged view of the under side of the lower support of the yielding supports. Fig. 6 is a front elevation of one of the apron drums. Figs. 7 and 8 are views of the cam to stop the feed of the apron. Fig. 9 is a detail showing the stop mechanism enlarged. A represents the main side timbers of the machine, supported upon legs. B. C represents the endless belt or blanket, having the side flanges, c. This belt travels over a frame, a side piece of which is shown by D, in which are journaled rollers, d, d, upon which the belt passes. J is a large roller or drum at the upper end or head of the machine, over which and by means of which the belt travels. The other end of the machine has a similar drum, J1, around which the belt passes at the lower end. B1 represents the water distributer, and C1 the ore distributer, from

which the ore is delivered upon the belt. The frame, D, is supported by elastic ou spring straps, E, adapted to yield sufficiently to allow the frame to swing. The lower ends of these straps, E, pass down inside of the main side timbers, A, and are supported by them through the medium of blocks, e, in a manner hereinafter explained. F is a shaft carrying the driving pulley, G. The end of shaft, F, is provided with a short crank, f, to which is connected a pitman, H, extending to and secured to frame, D. Power applied to pulley, G, causes the pitman, H, to move the frame, D, with its belt, C, forward and backward, swinging upon supporting straps, E, thus giving to said belt the side shake.

"In order to obtain the uphill travel of the belt, and make provision for its side shake, as just explained, we have the following: The drum, J, has a gudgeon, j. To this gudgeon is rigidly secured a strong spring, I, having a spiral shape, as shown, and adapted to yield laterally. Journaled in the frame is a shaft, K, carrying upon one end a larger gear wheel, L. To the other end of this shaft is secured a crank, k, the end of which engages the free end of spiral spring, I. The gear wheel, L, meshes with a worm gear, M, below. This worm gear is upon one end of a shaft, N, the other end of which carries a pulley, O, from which a belt, o, extends to a cone pulley, P, upon the shaft, F, above described. When power is applied to shaft, F, it is transmitted, as before described, to cause the side shake of the belt, and at the same time, through pulleys, P and O, shaft, N, and worm, M, it is transmitted to gear, L, and shaft, K. This shaft, revolving, causes its crank, k, to revolve the drum, J, by means of the spiral spring, I, which, though rigid for this pressure, yields laterally, and allows the drum, J, to move sidewise with the frame, D, and the belt. It is sometimes desirable to stop the uphill travel of the belt immediately. To do this we provide a circular casing or rim, Q, the hub, q, of which fits loosely, as a sleeve, upon shaft, K, or upon its bearing. This casing surrounds the gear, L, except at the bottom, where it extends downwardly, and forms a casing, as shown at $Q^1$, for the worm gear, M, and has a projection, $q^1$, supporting boxes, r, r, for bearings for shaft, N. Under certain circumstances it is highly desirable to instantly stop the movement of the belt, C, and, in order to accomplish this, the pulley, O, must be suddenly relieved from the effects of the driving belt, o, which we accomplish as follows: The pulley, O, shaft, N, boxes, r, r, worm gear, M, and casing, Q, $Q^1$, being all supported from one point, namely, the hub, q, of the casing surrounding shaft, K, they have a common rotary movement around said shaft, the preponderance of the weight, obviously, on the side towards the pulley, O, on shaft, N, tending to depress pulley, O, and keep the belt, o, stretched, so as to rotate pulley, O. By moving all the elements just previously recited so as to elevate the large pulley, O, the effect of the belt, o, ceases. From the rear of the portion $Q^1$ of the casing projects a stud, t, and moving on a spindle, 5, conveniently located on the machine, is a cam, S, rotating in a plane, at right angles to the shaft, N, and provided with the face, s, adapted to come in contact with the stud, t, and force it in the direction of the pulley, O. This movement rotates the casing, Q, $Q^1$, to a limited degree around shaft, K, and thereby raises worm gear, M, boxes, r, r, shaft, N, and pulley, O, the pulley moving through the longest arc, and being relieved from the effect of belt, o."

The particular mechanism of this patent to be considered in connection with complainant's patent is described by the patentee in the following language:

"It has been found by experience that, despite the greatest care and uniformity in making the class of machines, results will differ in machines of the same construction. In some the ore will bank or collect at one side of the belt against the flange, and in others it will bank in another place, without any apparent cause, as the belts all run smoothly and easily, and are, to all appearances, nicely adjusted. We have discovered that by changing to a limited degree the inclination of the supporting strips, E, the belt is affected in such manner as to remedy this fault, and to distribute the ore evenly over its surface. We accomplish this adjustment by means of a rocking nut, which

enables the operator to change the position of the faces of the supports of straps, E. The said supports are constructed as follows: Bolts, b, passing vertically through the timbers, A, hold beneath said timbers blocks, e, having their upper surfaces, where they bear against the timbers, rounded, as shown at $e^2$, and having longitudinal slots, $e^1$, to receive the bolts, and sockets, $e^3$, to receive the lower ends of the straps, E. The lower surface of each block has a longitudinal depression, $e^4$, in which rests a washer, i, having a curvilinear face, against which rests the head of the bolt when in position. A blow or a series of blows upon the block, e, will cause it to change position by rocking on the curved face, $e^2$, against the timber, A, and the curved face of washer, i, against the head of the bolt, so as to vary the position of strap, E, as to a vertical line. We do not confine ourselves to this particular construction or means for adjusting these strips, as there are many ways in which it can be accomplished. We consider, however, the way here shown as being a good one, as it secures the strips firmly, and yet allows their adjustment when necessary."

As represented in the drawings, the supporting strips, E, are exactly parallel to each other. The upper portion of the strips is almost flush against the side of the shaking frame, while the lower portion is in a similar position to the timbers of the stationary frame, not permitting of lateral adjustment to any marked degree. But it is asserted by the respondent that in the machines in actual use provision was made for the lateral inclination of the supporting strips to an extent not indicated in the patent, and that this use anticipated complainant's patent. It appears from the testimony that all ore concentrators are sensitive machines, and the operation of saving sulphurets and material of different specific gravities is a particularly delicate one. In the working of the machines the pulp is often unevenly distributed over the surface of the belt. This may result from irregularities in castings, unevenness of the floor upon which the machine stands, sagging of some parts of the framework, inaccuracies in fittings, or other causes incident to the violent shaking motion. To remedy this banking of the pulp in the Frue concentrators, it was found necessary to alter the inclination of the supporting strips, thus varying the level of the belt surface. Sometimes the proper adjustment was secured by blows upon the block, e, described in the specification; sometimes inclining but one supporting strip from the vertical, and sometimes altering the inclination of all. This naturally led to the construction of machines permitting the needed lateral adjustment of the supporting strips, and the testimony of many witnesses conclusively shows that the Frue machines in use for some time prior to the issuance of complainant's patent contained supporting strips having various degrees of inclination, often to the extent of $1\frac{1}{4}$ inches; that this inclination in a strip $17\frac{1}{4}$ inches long would not be noticeable to the casual observer, but that it did, as a fact, exist, and performed the functions of the improvement claimed by complainant in his patent. That complainant was the first to crystallize this idea into a machine having the inclined supporting strips or hangers as its chief improvement, and apply for a patent therefor, is undisputed. But was it not, at most, a very slight and formal advance in the art beyond what was known, and of very easy production to one skilled in the art, to construct a machine with the

96 F.--28

supporting strips always at a slight inclination from the vertical, and capable of adjustment to change the inclination until the even distribution of the pulp over the belt surface was secured, instead of a machine with vertical supports susceptible of adjustment to the desired inclination? The exact counterpart of complainant's patent has not been found in the prior art, it is true. But all the elements are old, and in ore concentrators have been in familiar use, in similar relations to each other, and performing the same functions as in the patent in controversy. Under the rule declared in Thompson v. Boisselier, 114 U. S. 1, 5 Sup. Ct. 1042, and often reaffirmed by federal and state authorities, "it is not enough that a thing shall be new, in the sense that the shape or form in which it is produced shall not have been before known, and that it shall be useful, but it must, under the constitution and statute, amount to an invention or discovery." Kelly v. Clow, 32 C. C. A. 205, 89 Fed. 297; Lumber Co. v. Perkins, 25 C. C. A. 613, 80 Fed. 528; Adams v. Stamping Co., 141 U. S. 539, 12 Sup. Ct. 66. In Capital Sheet-Metal Co. v. Kinnear & Gager Co., 31 C. C. A. 3, 87 Fed. 333, the court, in stating the requirements of invention, says:

"Long practice and observation naturally lead those familiar with the arts to the perception of new adaptations. Mechanical education and skill, fostered and promoted by the public, are rapidly advancing in every direction. and there is a constant and universal endeavor in handicraft to utilize that which is known, and press it into service in the practical arts. But the steps of this normal progress and improvement are not invention, nor the subject of monopoly to one who, in the exercise of the 'skill of his calling,' has put an old thing to a new use."

The intrinsic novelty and utility of the invention are also important considerations in determining the validity of a patent. That the patent in controversy does not possess the former attribute must be conceded, and it is not shown by the proofs that in its use and sale it was sought after and employed by the public to an extent indicating great, if any, utility, or that it was relatively superior to prior inventions. In the claims in controversy it is not possible to find anything of a mechanical or functional character which did not exist before in similar relations and combinations, nor evidence of invention or discovery. The conception of the combinations claimed involves "only the exercise of the ordinary faculties of reasoning upon the materials supplied by a special knowledge, and is in no sense the creative work of that inventive faculty which it is the purpose of the constitution and the patent laws to encourage and reward." Hollister v. Manufacturing Co., 113 U. S. 59, 5 Sup. Ct. 717. Let a decree be entered in favor of the respondent.