## UNITED STATES v. REBHUHN et al.
### No. 210.

Circuit Court of Appeals, Second Circuit.
Feb. 13, 1940.

Frank Aranow, of New York City (Arthur Garfield Hays, Paul Blanshard, Martin A. Roeder, S. Richard Silbert, and Oscar Stabiner, all of New York City, of counsel), for appellants.

John T. Cahill, U. S. Atty. (Richard Delafield and Boris Kostelanetz, Asst. U. S. Attys., both of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

The three defendants appeal from a judgment of conviction under § 334,

Title 18, U.S.Code, 18 U.S.C.A. § 334, for sending.obscene printed matter through the mails, and for a conspiracy to do so. The offending matter consisted of circulars which advertised books for sale, and both the books and the circulars were charged to have been obscene. The defendants raise a number of objections of which we will dispose in the order 'in which they appear in their brief. The first is that the statute is unconstitutional because it lays down no definite standard of criminal liability. The Supreme Court overruled this in Rosen v. United States, 161 U.S. 29, 16 S.Ct. 434, 480, 40 L.Ed. 606, and many indictments have since been found, and many persons tried and convicted. These very defendants challenged the indictment at bar in an action brought under § 380a of Title 28, U.S.Code, 28 U.S.C.A. § 380a, and were unsuccessful. If the question is to be reopened the Supreme Court must open it. Tyomies Publishing Company v. United States, 6 Cir., 211 F. 385.

The next question, and the only serious one in the case, is whether the books and circulars were obscene. This cannot be properly understood without some statement of the enterprise as a whole in which the defendants were engaged. One of them, Ben Rebhuhn, had done business under the name of "Falstaff Press" before any of the mailings here in question. Later the business was incorporated under the same name, and the corporation sent out many thousands of circulars at random; that is to say, the addressees were not selected with any eye to whether they might have a legitimate interest in the books advertised, and whether, on the contrary, it was not likely, or even reasonably certain, that those who bought would do so to gratify their lewdness. Of the fifteen counts in the indictment thirteen were for mailing circulars to individuals, and these made up a group of two girls of fifteen and nineteen, a woman of twenty-one, another who was a trained nurse, a fifth, employed by the Treasury Department, and a sixth who was a chiropractor; in addition there were two lawyers, an assistant United States attorney, a doctor, a business man, a boy at school, and, mirabile dictu, the financial agent of a society for the suppression of vice. The defendants assert that the circulars were not obscene, if taken alone, even if they described the books in such a way that the reader would sup-

pose them to be sexually exciting; and we shall assume arguendo that they made a case only under that part of the section which forbids sending information of where obscene writings can be obtained. It was the books that offended, if offence there was.

▮ These purported to be translations of works, written by authors who were either proved, or may be assumed, to have been men of scientific standing, as anthropologists, psychiatrists, and the like. Most of the books could lawfully have passed through the mails, if directed to those who would be likely to use them for the purposes for which they were written, though that was not true of one or two; for example, of that entitled, "Sex Life in England", which was a collection of short and condensed erotic bits, culled from various sources, and plainly put together as pornography. The defendants employed one, Malkin, to make the translations, which he did under various names; and, although there was no evidence as to how complete or accurate his work was, we will assume that it was honest, and that the works themselves had a place, though a limited one, in anthropology and in psychotherapy. They might also have been lawfully sold to laymen who wished seriously to study the sexual practices of savage or barbarous peoples, or sexual aberrations; in other words, most of them were not obscene per se. In several decisions we have held that the statute does not in all circumstances forbid the dissemination of such publications, and that in the trial of an indictment the prosecution must prove that the accused has abused a conditional privilege, which the law gives him. United States v. Dennett, 2 Cir., 39 F.2d 564, 76 A.L.R. 1092; United States v. One Book Entitled, Ulysses by James Joyce, 2 Cir., 72 F.2d 705; United States v. Levine, 2 Cir., 83 F.2d 156. However, in the case at bar, the prosecution succeeded upon that issue, when it showed that the defendants had indiscriminately flooded the mails with advertisements, plainly designed merely to catch the prurient, though under the guise of distributing works of scientific or literary merit. We do not mean that the distributor of such works is charged with a duty to insure that they shall reach only proper hands, nor need we say what care he must use, for these defendants exceeded any possible limits; the circulars were no more than appeals to the salaciously

disposed, and no sensible jury could have failed to pierce the fragile screen, set up to cover that purpose.

Since we are assuming arguendo that most of the circulars were not, however, themselves obscene, the question arises whether it was error to couple them with the books in the indictment. The indictment was not duplicitous. (Burton v. United States, 8 Cir., 142 F. 57) nor was there a material variance. The only possible harm, even on the assumption we are making, was that the jury might have based guilt upon the circulars and not upon the books; and if the case was properly presented to them, that danger did not exist. It is true, however, that the judge did not distinguish between the two, and that in theory the jury might have based conviction on the circulars alone, though that chance was extremely remote, for the purport of the enterprise as a whole was unmistakable, as we have said. Be that as it may, the defendants did not ask the judge to tell the jury that the circulars were not obscene; and the fact that during the argument on the motion to dismiss the indictment the point had been bruited, was not enough. If they were dissatisfied with the way in which the judge presented the case, they were bound to tell him so that he might mend his instructions. This they did not do.

Next they challenge the sufficiency of the proof to connect them with mailing the circulars, or to charge them with knowledge of the contents of the books. The evidence against them on these points was overwhelming. Ben Rebhuhn had done business as the "Falstaff Press", as we have already said, and after the company was incorporated, he signed one of the renewals of its lease. When one of the Post Office inspectors talked with him, as he did several times, and brought to his attention a number of complaints made by those who had received the circulars, he admitted that he was the owner of the business, and discussed the books advertised with familiarity, even saying that he was the author of some of them. Moreover, he had taken out the copyrights on nearly all. Ann Rebhuhn was the president of the corporation, and told the inspector that she was part owner of the business; she too was familiar with the books, and did not suggest that she had been ignorant of their contents, though she must have understood that the whole enterprise was under suspicion, and was being investigated for that reason. Ben Raeburn's name was upon many of the circulars and he told the inspector that he was office manager, and the proof-reader of the circulars, an admission which alone was enough to charge him with knowledge of the contents of the books, which the circulars disclosed beyond any question. Nothing more was necessary to prove that all three defendants were the moving spirits in the enterprise. The books put in evidence were, with one exception, certified as identical with copies filed in the Congressional Library upon securing the copyrights. The possibility that the books advertised, though they corresponded with these, not only in title, but in contents—as described in the circulars—were in fact other publications, does not deserve discussion.

Next it is objected that the judge refused to allow in evidence a copy of Havelock Ellis's "Psychology of Sex", in which it appeared that he had spoken with commendation of the works of several of the authors of the books in question. This evidence was offered in supposed conformity with what we said in United States v. One Book Entitled Ulysses by James Joyce, supra, 72 F.2d at page 708; and United States v. Levine, supra, 83 F.2d at page 157; i. e:, that the opinions of experts were competent to show the standing of the challenged publications. The refusal was error, because the foundation for receiving the book had been laid by proving Ellis' standing as an authority on the subject; it was not necessary that he should himself have been a witness. But the evidence, though competent, was neither necessary, nor even important. As we have already said, the books were not obscene per se; they had a proper use, but the defendants woefully misused them, and it was that misuse which constituted the gravamen of the crime. Thus it meant little to prove the standing of their authors, and the error ought not to be ground for reversal.

Next the defendants complain of the judge's definition of obscenity in his charge to the jury. It is true that this was contradictory; at the outset he adopted the old and abandoned standard of Regina v. Hicklin, L.R. 3 Q.B. 360, which he immediately followed by that of United States v. Levine, supra, and United States v. Dennett, supra; apparently unconscious that there was any difference between the two. The defendants never objected to the first

definition. At the conclusion of the colloquial charge they merely excepted to "any definitions made \* \* \* of the term obscene"; and that was clearly not enough; and later, when the judge himself brought up the first definition and asked what objection the defendants had to it, they merely replied that "the statute stated nothing about any tendency". It is not clear what they meant by this last, but certainly they were not insisting on the doctrine of United States v. Dennett, supra, or United States v. Levine, as opposed to what the judge offered. So far as can be inferred, at no time did they wish the jury to be told of any conditional privilege, perhaps for the obvious reason that it would not have helped them, since they had shamefully abused it.

They next object that the jury did not adequately examine the evidence, for which they rely upon the short time—less than three hours—that they were out. Aside from the fact that this was a question for the judge alone in deciding whether to grant a new trial, the point is without merit anyway. It needed less than the time they actually took for reasonably sagacious men and women to see exactly what the defendants had been doing, and how transparent was the pretence that they were not simply pandering to the lascivious cravings of their customers; it would have impugned their intelligence had they hesitated longer. Again, when the judge refused to poll them as to whether they had read all the documents, he was clearly right. It was unimportant whether they had; and in any case polling them could have had no other purpose than to impeach their verdict by showing how they had reached it. McDonald v. Pless, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300.

The last supposed error is that the indictment was invalid because it did not set forth the circulars in full; or did not, in the alternative, allege that they were too obscene to be extended upon the records of the court. That, if it was a defect at all, did not extend to the books themselves as to which the allegation was made. We are assuming that the contents of the circulars was important only as it described the books fully enough to advertise them for sale; moreover, copies of all of them were delivered to the defendants before trial in a bill of particulars. It would be absurd to reverse the conviction for such a formal defect; § 391, Title 28, U.S.Code, 28 U.S. C.A. § 391.

The convictions are affirmed.