## BAKER et al. v. UNITED STATES.
### No. 11683.

Circuit Court of Appeals, Eighth Circuit.

Nov. 20, 1940.

Rehearing Denied Dec. 7, 1940.

536

A. G. Bush, of Davenport, Iowa, and W. R. Donham, of Little Rock, Ark. (Fred A. Isgrig, of Little Rock, Ark., on the brief), for appellants.

Leon B. Catlett and W. H. Gregory, Asst. U. S. Attys., both of Little Rock, Ark. (Sam Rorex, U. S. Atty., of Little Rock, Ark., on the brief), for appellee.

Before STONE and GARDNER, Circuit Judges, and OTIS, District Judge.

GARDNER, Circuit Judge.

Appellants, who will be referred to as defendants, were indicted for violation of Section 215 of the Criminal Code, 18 U.S.C.A., Sec. 338, in an indictment containing seven counts. They were charged with having devised and with intending to devise a scheme to defraud and to obtain money and property by means of false pretenses and representations from sundry persons too numerous to mention. The scheme as alleged in the indictment may be generally described as a scheme to organize institutes and hospitals, and by means of telegrams, telephone, letters, pamphlets, circulars, advertisements, personal conversations and radio broadcasts falsely to pretend and report to the persons to be defrauded that surgical operations, X-ray treatments and radium treatments and all other remedies and treatments recommended and used by the members of the American Medical Association would not and could not in any event cure a cancer, but that Norman Baker, one of the defendants, had during the year 1929 discovered and perfected a sure cure for cancer; that thousands of people suffering from cancer had been cured by that remedy; that Baker Hospital at Eureka Springs, Arkansas and Baker Institute at Muscatine, Iowa, were the places for persons suffering from cancer to go for treatment; that only licensed and competent members of the medical profession who were not members of the American Medical Association were employed as physicians to administer the Baker cancer treatment at said institutes; that many persons who had been given up to die by members of the regular medical profession had been healed of cancer by the administration of the Baker cancer cure in said institutes;

that the price or fee for treatment by the defendants at said institutes was very small and that sufferers from cancer were usually relieved by taking the treatment for a period from three to six weeks; that in the event the cure was not perfected during the patient's first stay at the hospital all future treatments of the patient would be done by defendants free of charge, except for board, room and transportation; that defendants did further falsely report that cancer in its last stages could be and had been cured by the use of the so-called Baker treatments at the Baker Institute and Baker Hospital by distributing printed pamphlets and catalogues showing pictures of sufferers of cancer in its last stages, and in said pamphlets and catalogues to report and pretend that said sufferers had been completely cured by the defendants, it being a part of said scheme to pretend by means of telegrams, telephone, letters, pamphlets, circulars, advertisements, catalogues, personal conversations and radio broadcasts, that the defendants had discovered and were applying a perfected and sure cure for piles, rupture, prostate, varicose veins and numerous other diseases and ailments; that thousands of persons suffering from the diseases mentioned had been cured and were being cured by the defendants at the said hospitals; that persons attending said hospitals were treated by careful, competent licensed physicians. The falsity of the representations was specifically alleged, and it is then charged that for the purpose of executing said scheme and artifice to defraud and to obtain money by false pretenses, and in furtherance thereof, the defendants delivered certain letters and other printed matters through and by the Post Office establishment of the United States.

The indictment is very long, comprising forty printed pages of the record. Its sufficiency was challenged by demurrer, motion to quash, and motion to strike, all of which were overruled. At the close of the Government's evidence in chief, and again at the close of all of the evidence, defendants moved for a directed verdict of not guilty, which motions were denied and the case was submitted to the jury upon instructions to which the defendants saved certain exceptions, and they also requested certain instructions which were refused. The jury found the defendants guilty on each of the seven counts of the indictment, upon which verdict the court entered judgments and sentences from which the defendants prosecute this appeal.

In defendants' brief there is embodied "Assignments of Error Intended to be Urged," occupying sixty-six pages. It will, of course, be impossible separately to consider all of these assignments of error, and we find no very satisfactory grouping of them in the brief. The practice of unlimited assignments is a perversion of the rule requiring such assignments to direct the attention of the court and opposing counsel to the points upon which defendants' counsel intend to seek a reversal and to limit the discussion to such points. An indiscriminate assignment of errors leaves the court to gather from the brief which of the assignments are really relied upon as substantial. We shall attempt to give consideration to such assignments as seem to present some substantial question under the following headings: (1) The sufficiency of the indictment; (2) rulings of the court on the admissibility of evidence; (3) ruling of the court on motion for directed verdict; (4) instructions given and refused; (5) misconduct of Government counsel.

It is charged that the indictment was insufficient because it failed "directly and in express language" to allege that the scheme devised by defendants included obtaining money from the persons induced to come to the hospital, or inducing such persons to part with something of value. It is argued that it is an essential element of a fraud that the person to be defrauded should be induced to part with or be deprived of money or property of some value. The use of the Post Office Department in the execution of an alleged scheme to defraud or obtain money by false pretenses is the gist of the offense which the statute denounces. The devising of a scheme to obtain money by means of fraud or false pretenses is not a crime under the laws of the United States. It becomes a crime only in the event the United States mails are used in carrying out the scheme. Cochran v. United States, 8 Cir., 41 F.2d 193; Busch v. United States, 8 Cir., 52 F.2d 79; Hass v. United States, 8 Cir., 93 F.2d 427; United States v. Young, 232 U.S. 155, 34 S.Ct. 303, 58 L.Ed. 548. In Cochran v. United States, supra [41 F.2d 197], we said:

"While the scheme or artifice must be sufficiently set forth so as to advise the de-

fendants with the particulars thereof, yet the scheme need not be set forth with that particularity which would be required if the scheme was the gist of the offense."

█ Contrary to the contentions of counsel, the indictment alleges that the scheme devised was to obtain money or property by false pretenses. It is not essential that it be alleged that those to whom communications were sent by mail were in fact defrauded or that money was obtained from them. If, as alleged, the mails were used in carrying out a fraudulent scheme, it was quite immaterial whether the scheme were successful or unsuccessful. Busch v. United States, supra; Barnes v. United States, 8 Cir., 25 F.2d 61; Cochran v. United States, supra; Muench v. United States, 8 Cir., 96 F.2d 332.

██ It is urged that the letters mailed by defendants did not carry out the scheme, nor did the mailing of a package of salve. Letters to Loña Baker referred to treatment of her in the hospital at Eureka Springs. The first letter in count 1 gave information as to treatment. The second letter in count 2 referred to sending some medicine after she had been to the hospital. The letter in count 3 said that they had expected her to return for more treatment. The fourth letter stated it was hard to give a definite answer to what was causing pain in her shoulder and they advised her if possible to return to the hospital for a check-up. Letters set out in counts 5 and 6 were letters advertising and promoting the Baker Hospitals and their cure. Count 7 charged the mailing of a C. O. D. parcel addressed to Mrs. T. J. White, Fordyce, Arkansas, the contents unknown. Incidentally, it appeared in evidence that it contained a salve. All of these had such relation to the scheme as to have aided in its execution. The description in count 7 of the matter mailed is indefinite but that was ground for asking for a bill of particulars. While a bill of particulars was demanded and denied, there is no contention in the brief of error in this regard.

█ It is urged too that the indictment should have stated the true names of the persons to whom the mail was delivered but this objection is without merit. McClendon v. United States, 8 Cir., 229 F. 523; Durland v. United States, 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709. The statute does not require the name of the person to whom delivery is made to be stated, and where a name is not an essential element of an offense it need not be stated, nor, indeed, need it be alleged that the name was unknown to the grand jury. Kirby v. United States, 174 U.S. 47, 19 S.Ct. 574, 43 L.Ed. 890. Defendants made no claim of surprise. The fact, therefore, that in counts 5 and 6 defendants were charged with having caused mail matter to be delivered to fictitious names employed by the Post Office inspectors was not material. We conclude that the indictment was not subject to the attacks urged by defendants.

█ J. E. McElroy, called as a witness for defendants testified to treatment at the Baker Hospital. On cross-examination he was asked as to whether he did not have certain venereal diseases. No objections were made to this testimony and it all related to the direct examination and there was therefore neither error nor prejudice. Other witnesses who testified as to treatment were asked similar questions to which there were no objections.

█ Defendants offered in evidence three reels of motion pictures. Objections to the offer were sustained. The pictures were offered to show the treatment of patients at the Baker Hospitals for cancer and the progress made until discharge. Proper foundation was not laid for their admission. There was nothing in them that could not be better proved by oral testimony of witnesses. In any event, the exclusion was discretionary and there was no abuse of that discretion. Wharton, Criminal Evidence, 11th Ed., p. 1355; State to Use of China v. United Railways & Electric Co., 162 Md. 404, 159 A. 916, 83 A.L.R. 1307; Pandolfo v. United States, 7 Cir., 286 F. 8.

█ Certain patients who came to the Baker Hospital for treatment were not permitted to testify that other doctors had told them they had cancer, and letters alleged to show that fact were also rejected. The evidence was offered generally and not for any limited purpose. The offer of proof contained no suggestion that the witness had communicated the alleged conversation to the defendants or hospital authorities. The evidence was clearly hearsay and would seem to have no bearing upon any issue and was properly rejected.

█ O. L. Beatty was a defendant in the lower court who was acquitted. Dale Alexander testified that in 1927 he arranged for the issuance of a medical

diploma to Beatty by the American Medical University at Kansas City for $800. As a defendant, his qualifications as a practitioner were open to examination, and hence, the evidence was admissible. But the error, if any, would not seem to be available to the defendants since Beatty was acquitted.

We have examined the other assignments of error with reference to the rulings of the court on the admissibility of evidence but find them wholly without merit.

One of the alleged fraudulent representations charged in the indictment was to the effect "that surgical operations, X-ray treatments and radium treatments, and all other remedies and treatments recommended and used by the members of the American Medical Association would not and could not in any event cure cancer, but that Norman Baker, one of the defendants herein, had during the year 1929 discovered and perfected a sure cure for cancer." In support of the contention that the evidence is insufficient to sustain a verdict, it is urged that this alleged representation was at best a mere matter of opinion. There was substantial evidence by eminent experts that the proper method of treatment of cancer was by use of surgery, X-ray and radium. Conceding that defendants could honestly have entertained an opinion as to the efficiency of some or all of these methods of treating cancer, yet reading the quoted allegation as a whole, the falsity appears in using this possibly fair difference of opinion as a step in assuring the public that in contrast Norman Baker, one of the defendants herein, had during the year 1929 discovered and perfected a sure cure for cancer. There may be a good faith difference of opinion as to the value and efficacy of the use of certain medicine or a curative practice. American School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90. But it is also true that what is advanced as an opinion may only be a device intended to deceive, so wanting in basis, factual, rational or otherwise, that it must be denounced as a fraudulent representation. Aycock v. O'Brien, 9 Cir., 28 F.2d 817; Stunz v. United States, 8 Cir., 27 F.2d 575; Leach, etc., v. Carlile, etc., 258 U.S. 138, 42 S.Ct. 227, 66 L.Ed. 511; Farley v. Heininger, 70 App.D.C. 200, 105 F.2d 79. There was evidence compelling the conclusion that the Baker cure was a pure hoax.

Defendants advertised that Baker, who was not a physician, had "a treatment * *· * that permanently cures cancer"; that he had "a wonderful cure," and "an amazing cancer cure;" that he had discovered a "positive cure for cancer," and other equally positive and wholly false statements. A detailed recital of this evidence would serve no useful purpose. It conclusively shows beyond all peradventure of doubt that this representation of a positive cure for cancer was made and it was utterly false.

It is urged that there is an absence of evidence of an intent to defraud, because the evidence shows that 2401 patients were examined at the Baker hospitals at Eureka Springs, Arkansas and Muscatine, Iowa, and turned away because their diseases were so far advanced that they were beyond medical aid. It is also said that there was no proof that fake examinations as charged were made. The evidence shows that many patients were accepted and that many were admitted with only superficial treatment at best. A practical nurse, without any training, gave treatments consisting of colonic and vaginal packs to women, which is treatment that should be given only by or under the direction of a doctor. There were no microscopes to be found in the hospitals. From March to September, 1930, there was no pathology attempted. Dr. J. W. Miller, an eclectic doctor employed from January 31, 1938 until June 21, 1938, gave the same hypodermic injections· to all patients— Number 4 and Number 5, but did not know what either contained. Dr. J. W. Cotner, an eclectic doctor, employed from December 15, 1937, to April 25, 1938, gave injections Numbers 4 and 5 hypodermically for everything that a patient had regardless of the disease. He gave the needle injections to over 300 patients in the mornings with the assistance of two nurses. He did not know the name of the medicine he was using. Dr. W. S. Hutto, employed from April 6, 1938, to July 31, 1939, testified that there was no way of determining for sure that patients at the Baker Hospital had cancer. The chief of staff, Beatty, testified that he detected cancer by palpation, feeling of it and guessing whether the patient had it or not. Statler, chief at Muscatine, Iowa and medical adviser at Eureka Springs, Arkansas, testified that you judged cancer from looking at the patient. Maud Randall, employed at the Baker Hospital, was given a formula by Norman

Baker, from which he instructed her to brew tea for patients, the formula being watermelon seed, brown cornsilk and clover leaves. Baker boasted that he would make a million dollars out of the suckers in the states if he could keep his broadcasting station open.

There is evidence in the record to the effect that an examination of the patients consisted of pinching them and looking at them. Injection Number 4 contained .18 of one per cent hydrochloric acid, .03 per cent of salt, and a trace of phosphate, the rest being water. Injection Number 5 contained 25.53 per cent glycerin, 28.4 per cent carbolic acid, and the balance alcohol. Eminent medical experts testified that the remedies used would not effect a cure for cancer nor do any good to anything. Many other facts in evidence might be related but the evidence which is here recited abundantly shows the lack of any basis for good faith in defendants.

Something more should perhaps be said relative to the relations of the defendants to the projects and scheme. Norman Baker, prior to 1929 was a grocery merchant at Muscatine, Iowa. R. A. Bellows, superintendent of the Baker Hospital at Eureka Springs, Arkansas, had been connected with Norman Baker in the operation of the hospital at Muscatine, Iowa, since its establishment in 1929. Statler was a graduate of Barnes Medical College at St. Louis, Missouri, in 1909 and was admitted to practice in Missouri in 1909. After engaging in the general practice of medicine at various points in Missouri, he moved to Iowa, registered to practice medicine in that state by reciprocity, and engaged in the practice of medicine at several points before he finally moved to Muscatine in January, 1930, when he began to work at the Baker Hospital at that place. In January, 1938, he went to Eureka Springs, Arkansas in connection with the Baker Hospital. He applied for license to practice medicine in Arkansas on reciprocity from Iowa, but license was refused. He then acted as medical adviser at the Baker Hospital at Eureka Springs, Arkansas. Norman Baker in 1929 heard of the treatment of cancer by Dr. Ozias in Kansas City by hypodermic process, and selected five test patients suffering from cancer and sent them to Dr. Ozias for treatment. After these patients had been treated by Dr. Ozias, Baker over a radio station at Muscatine, Iowa and in a magazine which he published, announced that a treatment had been discovered for cancer. In No-

vember, 1929, he opened the Baker Hospital at Muscatine. The magazine, first issued in December, 1929, stated that the five test patients had been cured. Reprints carrying the same story were sent out in January, February, March, April and July, 1930. These test patients in fact died of cancer November 25, 1929, January 7, 1930, December 28, 1929, May 3, 1930, and February 25, 1930, respectively. Dr. Ozias did not give Baker his formula for treatment of cancer, but two persons in his employ went to work for Baker. In 1936, Baker published a book entitled, "Doctors, Dynamiters and Gunmen," in whch he again made claim to having favorably treated these test patients, all of whom had in fact been dead from cancer several years. This book, and circulars and magazines, containing in vivid fashion these false claims to a cure for cancer and other diseases, were sent through the United States mails in great quantities.

It is urged that there was no evidence to show that the defendant Statler had anything to do with causing the delivery of letters set out in the indictment. The evidence conclusively shows that Statler was a party to the scheme and even though a conspiracy is not charged, yet when such a scheme is clearly participated in by more than one individual, it constitutes in and of itself a conspiracy. Chambers v. United States, 8 Cir., 237 F. 513, 524. The scheme in its very nature contemplated the use of the mails. In the last cited case it was said: "Where two or more persons jointly devise and execute a scheme to defraud by the use of the mails, they may thereby become in effect partners in the criminal purpose of so using the mails to defraud. If they do, the acts of each thereafter, during the existence and execution of the scheme, done in furtherance of that execution, may become the acts of all the partners, and each may be convicted of the mailing of a letter which one of his partners caused to be mailed in the execution of the scheme."

See, also: Robinson v. United States, 9 Cir., 33 F.2d 238; Cochran v. United States, supra.

There was, we think, abundant evidence to sustain the verdict, and the court committed no error in denying defendants' motion for a directed verdict of acquittal.

In instructing the jury, the court said that the indictment alleged that

the representations of the defendants "were known by the defendants to be false and fraudulent, or were made in reckless disregard of whether or not they were true and not knowing or caring whether or not they were true." It is now urged that the instruction was erroneous because the indictment does not contain the allegation that the claims or representations were made "in reckless disregard of whether or not they were true or not knowing or caring whether they were true." No such objection was made at the trial. Counsel then objected to repetition of the words "recklessly," or "without knowing they were true," because it was such "as to over-emphasize the law in regard to such." The record does not impel a review of the question now urged, if otherwise tenable. Ryan v. United States, 8 Cir., 99 F.2d 864; United States v. Rebhuhn, 2 Cir., 109 F.2d 512. In any event, the charge that the representations were false was the legal equivalent of a charge that they were made in reckless disregard of the truth. Stunz v. United States, supra. The court read the statute to the jury and observed that the defendants were charged with violating it. He charged the jury that good faith was a defense to the action and that defendants were guilty if they made the statements knowing them to be false or made them recklessly without knowing them to be true or false. No prejudice, we think, could have resulted from this characterization of what was charged in the indictment.

 It is contended that the instructions improperly placed the burden of proof upon defendants. Boatright v. United States, 8 Cir., 105 F.2d 737, is relied upon. There is no similarity between the charge to the jury in that case and the charge here considered. In the Boatright case, the court gave negative instructions in effect advising that if the jury should find that the defendants did not devise a scheme to defraud, that if the jury should find that the defendant did not make false representations, and if the jury should find that there was no intention on the part of defendants to obtain money by false pretenses, then the defendants should be acquitted. The court here charged on the presumption of innocence and distinctly told the jury that they must be satisfied of the guilt of the defendants beyond a reasonable doubt, and otherwise they must acquit them. In outlining the defenses presented, the court told the jury that if they found these de-fenses true, the jury should find the defendants not guilty, but the court properly charged the jury as to the elements of the crime and what it was necessary to establish to warrant a conviction, and advised that these elements must be established by the evidence beyond a reasonable doubt. The short answer to this contention is that there was no exception to the charge of the court on this ground, nor, indeed, was this portion of the instruction excepted to on any ground. The court repeatedly instructed that good faith was a defense, and the instructions must be read as a whole, and when so read it is clear that they did not place the burden of proof upon the defendants. It is worthy of note that in the instructions requested by defendants, they asked the court to say to the jury: "You are further instructed that if any of the defendants believed the alleged said misrepresentation set out in the indictment to be true, you should acquit such defendant." Again, they asked the court to instruct: "If you believe from the evidence that defendants acted in good faith in claiming a cure for cancer and other diseases, then you are instructed to acquit the defendants." These requested instructions, if considered alone, came more nearly placing the burden of proof on the defendants than did the instruction complained of.

 Complaint is made of the court's instruction on the question of reasonable doubt. It is urged that the record did not warrant the court in referring to "a doubt suggested by the ingenuity of counsel." A reference to the instruction shows that the court did not take from the defendants a doubt that might be suggested by the ingenuity of counsel, but only took from them "a doubt suggested by the ingenuity of counsel *not legitimately warranted by the evidence or the want of it.*" The instruction was not objectionable.

It is urged that issues were submitted to the jury which had no basis in the evidence. Among these are found the charge that surgery, radium, X-ray and other remedies used by the members of the American Medical Association would not cure cancer. As has already been pointed out, whether defendants could properly be convicted alone upon this as a representation made recklessly or negligently seems unnecessary to decide because it was not the entire representation, but it was coupled up with the important thing—a representation that de-

fendants had a positive cure for cancer, which was false. There was evidence, however, that surgery, X-ray and radium were the only recognized methods of treatment.

It is urged that the court erred in many instances in instructing the jury or in refusing instructions, but these contentions are based upon the assumed absence of evidence showing bad faith or recklessness, if not falsity in the making of the statements. The jury having found that defendants devised a scheme to defraud, necessarily found bad faith and guilty knowledge. The claim that there was no falsity in certain statements made, or that certain other statements were not made in bad faith, disregards the nature of the offense. The offense consists in devising a scheme to defraud and in utilizing the Post Office establishment for the purpose of executing or attempting to execute the scheme. Hass v. United States, supra. As said by this court in Cowl v. United States, 8 Cir., 35 F.2d 794, 798: "Of course, there cannot be a conviction on a different scheme than that charged in the indictment, but it is not necessary that all the alleged false representations be proved as part of the scheme. A scheme to defraud is necessarily made up of numerous elements. No particular element need be proved if sufficient is shown to constitute the scheme to defraud."

We have considered the alleged error of the court in refusing various instructions requested by the defendants. These requests are for the most part based upon the assumption that there was no sufficient evidence of the particular matters referred to in the instructions. The defendants asked the court to so declare. We have already considered the evidence and have found it sufficient to warrant the jury in returning a verdict on each of the matters referred to in these requested instructions. It was therefore not error to deny them.

It is contended that defendants were denied a fair trial by reason of misconduct of the District Attorney, and this, in our opinion, presents the most serious question in the case. Dr. Edward M. Perdue was called as a witness for the defendants, whereupon the following occurred:

"By Mr. Donham (counsel for defendants): State your name.

"Mr. Rorex (United States attorney): I object for the following reasons—

"The Court: Wait until he qualifies him as a witness.

"Mr. Rorex: Don't make any difference. He can't testify at all.

"Mr. Donham: You mean the witness can't state his name?

"Mr. Rorex: I say he can't state anything. He is here as a witness in this court—

"Mr. Donham: I don't understand, Your Honor. I thought a witness would certainly be permitted to tell his name.

"Mr. Rorex: I think he can't for several reasons, because his license has been revoked, and he don't have any license to practice medicine.

"The Court: It doesn't keep him from telling his name, wait until he qualifies him.

"Mr. Donham: We object to the statement of the district attorney.

"Mr. Rorex: All right, let him go ahead then.

"The Court: That objection is sustained. Go ahead. You will not consider that, gentlemen of the jury.

"Witness: My name is Edward M. Perdue. I reside in Kansas City, and have for forty years, and am a physician, a practicing physician, and have been for forty years next April, and have been engaged in the practice continuously for forty years, and am engaged now, in Kansas City, Missouri.

"Mr. Donham: Do you treat any disease specially, Doctor, and have you in the past and do you now—

"Mr. Rorex: We object.

"The Court: That objection is overruled.

"Mr. Rorex: I would like to state my objection, if Your Honor please.

"The Court: You can cross examine him as to his qualifications.

"Mr. Rorex: I think it is very unfair for him to bring a man here who has no license.

"Mr. Donham: We object to the statement of the district attorney.

"The Court: That objection is sustained, and you are not to consider that, gentlemen of the jury. Mr. Rorex, you will have to wait, and he has a right to ask this man as to his qualifications; then, if you want to, you take him and cross-examine him as to his qualifications. You may do that at the proper time.

"Mr. Rorex: If the court please, could the most desperate sort of man come in here and testify—

"Mr. Donham: We object to the statement of the district attorney.

"Mr. Rorex: Some man that a fraud order has been issued against him and we won't have that in the record unless we can introduce it.

"Mr. Donham: We ask the court to reprimand the district attorney about his language and we save exceptions.

"The Court: This is as to his credibility and not his qualifications (looking at paper in his hand).

"Mr. Rorex: We think we have a right to go to the jury as to whether this is an upright fellow—

"Mr. Donham: We object to the statement of the district attorney and ask the court for a ruling as to whether or not it is competent and save exceptions to the remark of the district attorney.

"Mr. Rorex: I ask the right to ask him if he hasn't had a fraud order issued against him.

"Mr. Donham: I object to the remark of the district attorney before the jury.

"The Court: You will not consider that, gentlemen of the jury. I wish you would stop talking while I am reading this.

"Mr. Rorex: I do want to show that there is a fraud order.

"The Court: Mr. Rorex, I have asked you to stop making statements in the presence of the jury, and you had better be seated. I want to read this and see what you have to offer. You will not consider that, gentlemen of the jury."

This outrageous conduct on the part of the Government attorney was unethical, highly reprehensible, and merits unqualified condemnation. "The primary duty of a lawyer engaged in public prosecution is not to convict but to see that justice is done." Canons of Professional Ethics No. 5. Admitting, however, that the conduct was reprehensible and inexcusable, it does not necessarily follow that it was so prejudicial in character as to compel a reversal in this case. The court promptly sustained all objections interposed by counsel for defendants, admonished the jury not to consider any of the statements made by counsel, and in effect rebuked counsel for making statements in the presence of the jury and admonished him to be seated. There was no motion for a mistrial. In considering the question of the prejudicial character of this conduct, it is observed, first, that the statements were not made of or concerning either of the defendants, but with reference to a witness, and second, in substance the matters stated, later all appeared in the testimony during a proper examination and cross-examination of the witness. The jury could have received no impressions from these improper statements, other than those which were established by competent undisputed evidence. We think it affirmatively appears from the record that this conduct, although reprehensible and improper, could not have been prejudicial and hence it is not ground for reversal. Morgan v. United States, 8 Cir., 98 F.2d 473; Lau v. United States, 8 Cir., 13 F.2d 975; Ginsberg v. United States, 5 Cir., 96 F. 433.

Dr. Ozias was asked about the test patients sent to him by Baker for treatment and the Government attorney asked and he answered questions indicating that Baker had not paid him for treating the test cases and that he had not given Baker his formula for treatment. It is urged that this was misconduct, but no objection was interposed to the testimony. There was no ruling on its admissibility and there is therefore nothing in this incident for review. McCutchan v. United States, 8 Cir., 70 F.2d 658.

The defendant Baker did not take the witness stand and his counsel, in referring to a Government witness by the name of Bunker, who had testified to certain statements made by Baker said: "Then he calls attention to the fact that this man Bunker had testified that Norman Baker had said, way back there somewhere—that he would rob the suckers of America of a million dollars or so. I don't know what you thought about Bunker, but I got my mind fully made up about Bunker. I think the e-r ought to be left off his name—and he ought to be called pure Bunk."

There were other references by counsel for the defendants characterizing Bunker. The Assistant District Attorney in his closing argument, commenting upon the testimony of the witness Bunker and the remarks of counsel for the defendants with reference to him, said: "This man Bunker testified that Norman Baker employed him in connection with his radio and that Nor-

man Baker told him that if he could find suckers enough he was going to make a million dollars. Do you think that kind of testimony can just be disposed of by calling the man Bunk? He at least had manhood enough and respectability enough to leave Baker when he found out what sort of a racket he had. And then, another thing that strikes me as strikingly strange, is that there is not one line of testimony to contradict what Bunker said. If Bunker is a Bunk, why didn't you prove it? But they were silent—they are as dumb as the dead and silent as the tomb until they come to argue and then they want to denounce the fellow."

 It thus appears that counsel for defendants provoked the remarks of the Assistant District Attorney by assailing the veracity and credibility of Bunker. Counsel may make any argument which is based upon evidence or reasonable inferences therefrom and may reply to argument of opposing counsel, and in doing so may make statements which might otherwise be improper. Malone v. United States, 7 Cir., 94 F.2d 281. The Fifth Amendment and the statute, 28 U.S.C.A. § 632, protect the defendant in a criminal prosecution in the right to remain off the witness stand, and prosecuting attorneys may not comment on the fact that the accused may have availed himself of that right (Rice v. United States, 2 Cir., 35 F. 2d 689), but fair response to argument of counsel for the accused does not violate the Constitution nor the statute. .Rice v. United States, supra; Kearns v. United States, 9 Cir., 27 F.2d 854; Comeriato v. United States, 4 Cir., 58 F.2d 557.

The statement of counsel that certain evidence is not denied is not a violation of the safeguard vouched an accused by the law. In Lefkowitz v. United States, 2 Cir., 273 F. 664, 668, it is said: "It is only objectionable to comment upon the failure of the defendant personally to testify; and if at the close of the whole case any given point stands uncontradicted, such lack of contradiction is a fact, an obvious truth, upon which counsel are entirely at liberty to dwell."

Here there was no direct reference to the failure of Baker to testify. The argument that he alone could have been meant by counsel is not well founded. Nothing in the record shows that Baker and Bunker were alone when the alleged statement was made. The court was not asked to rebuke counsel for the argument. In response to objections to this argument made by counsel for defendants, the lower court advised the jury that Baker did not have to take the stand, and the fact that he had not done so should not be considered by them. If there was any misconduct in this regard, it was cured by the court's instructions. Comeriato v. United States, supra; United States v. Di Carlo, 2 Cir., 64 F.2d 15; United States v. Shapiro, 2 Cir., 103 F.2d 775.

A review of the record convinces us that the judgment appealed from is just and that the defendants had a fair trial and no errors to their prejudice were committed. The judgment is therefore affirmed.