**UNITED STATES of America,**

v.

**Willie C. CHILDRESS, et al.**

**Crim. No. 89–0162.**

United States District Court, District of Columbia.

Aug. 29, 1990.

**1124**

Jay B. Stephens, U.S. Atty., District of Columbia and Asst. U.S. Attys., John P. Dominguez and David Schertler, for the Government.

Ernest W. McIntosh, Jr., Washington, D.C., for defendant Willie Childress.

Arthur M. Levin, Washington, D.C., for defendant Columbus Daniels.

William Garber, Washington, D.C., for defendant Rachelle Edmond.

Stuart F. Johnson, Washington, D.C., for defendant Robert Hardy.

W. Gary Kohlman, Washington, D.C., for defendant Constance Perry.

Sol Rosen, Washington, D.C., for defendant Melvin Stewart.

Retna Pullings, Washington, D.C., for defendant Jeffrey Thompson.

Nina Kraut, Washington, D.C., for defendant Raynice Thompson.

Dennis Hart, Washington, D.C., for defendant Ronald Morgan.

**CHARLES R. RICHEY, District Judge.**

This case began on May 15, 1989 when a grand jury handed down a thirty-nine count indictment charging twenty-nine persons with conspiracy to violate the narcotics laws and various other offenses; a Superseding Indictment was filed on June 20, 1989, with four additional counts.[1] Thereafter, on August 9, 1989, the Court filed an Order severing the defendants and counts

1. In addition to charging conspiracy, the Superseding Indictment also charges continuing criminal enterprise, interstate travel in aid of racketeering, unlawful use of a communications facility, distribution of and possession with the intent to distribute cocaine and cocaine base, unlawful employment of persons under eighteen years of age, maintaining a premises for an unlawful purpose, using and carrying a firearm in connection with a drug trafficking offense, first-degree murder, and carrying a pistol without a license. Also, two counts of the Superseding Indictment deal with asset forfeiture.

into three separate trials. The first trial arising out of the Superseding Indictment, which involved eleven defendants, began on September 11, 1989; a jury returned "guilty" verdicts as to all defendants on all counts on December 6, 1989, with the exception of the count charging the defendant James Antonio Jones with possessing with the intent to distribute cocaine. The second trial, which involved nine defendants, began on February 26, 1990, and a jury returned "guilty" verdicts as to all of the defendants on all counts on March 30, 1990.[2]

Now before the Court are motions by the defendants in the second trial for judgment of acquittal and/or a new trial. Defendants request a new trial for a variety of reasons which include, but are not limited to, the Court's instructions to the jury on the elements of a conspiracy in violation of 21 U.S.C. § 846, misconduct by the prosecutor in his closing and rebuttal argument, the use of an anonymous and sequestered jury, the Court's denial of the defendants' motion for change of venue, the format of the verdict form employed by the Court, and one defendant's inability to call what he considered to be an essential witness.[3] Upon careful consideration of the defendants' motions, the supporting and opposing legal memoranda, the underlying law, and the entire record herein, the Court will deny the defendants' motions for judgment of acquittal, with the exception of the defendant Ronald Morgan's motion for judgment of acquittal on conspiracy, which the Court will grant. The Court will also deny the defendants' motions for a new trial.

## I. *Sufficiency of the Evidence*

■ At the conclusion of all the evidence, each defendant made an oral motion for judgment of acquittal; pursuant to Rule 29(b) of the Federal Rules of Criminal Procedure, the Court reserved decision on these motions until after the jury returned a verdict. "After view[ing] the evidence in the light most favorable to the government, allowing the government the benefit of all reasonable inferences that may be drawn from the evidence, and permitting the jury to determine the weight and credibility of the evidence," *United States v. Sutton,* 801 F.2d 1346, 1358 (D.C.Cir.1986) (citing *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *United States v. Singleton,* 702 F.2d 1159, 1163 (D.C.Cir.1983); *United States v. Fench,* 470 F.2d 1234, 1242 (D.C. Cir.1972)), the Court concludes that there is substantial evidence upon which a rational jury could have found the essential elements of the crimes charged against each defendant beyond a reasonable doubt, with one exception. That exception is the conspiracy charge against the defendant Ronald Morgan.[4]

■ The evidence pertaining to Ronald Morgan covers a limited period of time—September 28 and 29, 1988. On September 28, 1988 at approximately 11:58 a.m., the defendant Morgan and David McCraw talked with one another over the telephone and agreed to meet at about 1:15 p.m. at First and K Streets, N.W. to engage in a transaction involving one kilogram of co-

**2.** The defendants in the second trial were Willie G. Childress, Columbus Daniels, Rachelle Edmond, Robert Hardy, Ronald Morgan, Constance D. Perry, Melvin Stewart, Jeffrey Thompson, and Raynice Thompson. The jury found each of these defendants guilty of participating in a conspiracy to violate the narcotics laws of the United States. In addition, the defendant Melvin Stewart was found guilty of distributing a controlled substance; the defendants Rachelle Edmond, Jeffrey Thompson, and Raynice Thompson were found guilty of engaging in interstate travel in aid of racketeering; and the defendant Ronald Morgan was found guilty of possessing with the intent to distribute 500 or more grams of a controlled substance.

**3.** The defendants claim they are entitled to a new trial for additional grounds as well; however, the Court will not address those grounds in this Opinion either because they have been adequately addressed in previous written or oral rulings by the Court or because under well-established principles of law they are not meritorious.

**4.** The defendant Ronald Morgan still stands convicted of possessing with the intent to distribute 500 or more grams of a controlled substance.

caine.[5] When McCraw and Morgan met, McCraw gave Morgan a brown bag containing one kilogram of cocaine, and in return Morgan gave McCraw a white envelope containing money. Moments after Morgan drove away from the vicinity of First and K, members of the Drug Enforcement Administration ("DEA") and the Metropolitan Police Department stopped Morgan and found a kilogram of cocaine in the trunk of his car.

■ The day of his arrest Morgan agreed to meet Special Agent John A. Cornille of the DEA at the DEA office the next day to provide information which would assist in an investigation. The next day Morgan told Special Agent Cornille that he contacted Tony Lewis on September 28, 1988, and Lewis told him to get in touch with David McCraw. Morgan also told Special Agent Cornille that he knew Lewis had two lieutenants working for him, and that he had purchased half of a kilogram or a kilogram of cocaine through Lewis on at least sixteen other occasions.

Morgan's purchasing cocaine from McCraw and his possession of the cocaine with the intent to distribute it—standing alone—are not sufficient to establish that Morgan was a member of the charged conspiracy because, by themselves, these acts do not demonstrate Morgan's awareness of a common unlawful endeavor or his agreement to join such an endeavor. See United States v. Morris, 836 F.2d 1371, 1374 (D.C. Cir.1988) (holding that the law is "perfectly clear ... that a buyer-seller relationship does not make out a conspiracy even if the item to be sold is one to be used illegally"); United States v. DeLutis, 722 F.2d 902, 906 (1st Cir.1983) (holding that defendant's "single purchase, without more, would not be sufficient to infer that he had knowledge of the conspiracy nor an intent to participate in it"). Other than the evidence about Morgan's transaction with David

McCraw at First and K on September 28, 1988, there was no mention of Morgan at trial other than Special Agent Cornille's testimony about the statement Morgan made to him on September 29, 1988. Because the statement Morgan made to Special Agent Cornille was not corroborated, the statement cannot provide a basis for convicting Morgan of conspiracy.[6]

" 'It is a settled principle of the administration of criminal justice in the federal courts that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused.' " United States v. Marshall, 863 F.2d 1285, 1287 (6th Cir.1988) (quoting Wong Sun v. United States, 371 U.S. 471, 488–89, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963)). "An accused's admissions of essential facts or elements of the crime subsequent to the crime, are of the same character as confessions" and must also be corroborated in order to form the basis for a conviction. Opper v. United States, 348 U.S. 84, 90, 75 S.Ct. 158, 162–63, 99 L.Ed. 101 (1954).

In one of its seminal decisions on the corroboration requirement, the Supreme Court explained:

The corroboration rule, at its inception, served an extremely limited function. In order to convict of serious crimes of violence, then capital offenses, independent proof was required that someone had indeed inflicted the violence, the so-called *corpus delicti.* Once the existence of the crime was established, however, the guilt of the accused could be based on his own otherwise uncorroborated confession. But in a crime such as tax evasion *there is no tangible injury* which can be isolated as a *corpus delicti.* Thus we are faced with the choice either of applying the corroboration rule to this offense and according the accused even greater protection than the rule affords to a defendant in a homicide prosecution, or of

---

5. On December 6, 1989, a jury in the first trial convicted David McCraw and Tony Lewis, as well as nine other persons, of the same conspiracy with which the defendant Morgan is charged.

6. In his post-verdict motion, although the defendant Morgan argued there was insufficient evidence to convict him of conspiracy, he did not contend that his statement to Special Agent Cornille on September 29, 1988 could not be considered because of the absence of any corroboration.

finding the rule wholly inapplicable because of the nature of the offense, stripping the accused of this guarantee altogether. *We choose to apply the rule, with its broader guarantee to crimes in which there is no tangible corpus delicti, where the corroborative evidence must implicate the accused in order to show that a crime has been committed.* Smith v. United States, 348 U.S. 147, 154, 75 S.Ct. 194, 198–99, 99 L.Ed. 192 (1954) (emphasis added). Since conspiracy is a crime where there is no tangible injury which can be isolated as a corpus delicti, "[a]ll elements of the offense must be established by independent evidence or corroborated admissions." *Id.* at 156, 75 S.Ct. at 199. In view of the absence of any corroboration as to the statement Morgan made to Special Agent Cornille, the evidence, viewed in the light most favorable to the government, is insufficient to uphold Morgan's conspiracy conviction because it proves nothing more than a buyer-seller relationship between Morgan and McCraw. Accordingly, the Court will grant the defendant's motion for judgment of acquittal on the conspiracy charge against him but not the crime of possession with intent to distribute 500 or more grams of a controlled substance as set forth in Count Five.

## II. *Motions for New Trial*

### A. *Jury Instructions on Conspiracy*

The Court instructed the jury that the elements of a conspiracy in violation of 21 U.S.C. § 846 are:

First, that an agreement existed between two or more persons to distribute or to possess with the intent to distribute more than 5 kilograms of a mixture or substance containing a detectable amount of cocaine or more than 50 grams of a mixture or substance containing a detectable amount of cocaine base, also known as crack; and

Second, that the defendant knowingly and voluntarily joined the conspiracy.

*Court's Jury Instructions* at 27.

The defendants claim that they are entitled to a new trial because the Court neglected to include "specific intent" as an element of the offense of conspiracy.[7] In addition, the defendants maintain that the Court erred in labelling the offense of conspiracy as a general intent crime.

■ Contrary to the defendants' delineation of the elements of a § 846 conspiracy, the cases construing the elements of this offense clearly hold that "[i]n order to convict a defendant of a Section 846 conspiracy, the government must prove only that the defendant knew of it, and that, with knowledge, the defendant voluntarily became a part of the conspiracy." *United States v. Terzado–Madruga,* 897 F.2d 1099, 1121 (11th Cir.1990); *see also United States v. Lewis,* 902 F.2d 1176, 1180–81 (5th Cir.1990); *United States v. Bowie,* 892 F.2d 1494, 1497 (10th Cir.1990); *United States v. Cooper,* 873 F.2d 269, 272 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 118, 107 L.Ed.2d 79 (1989); *United States v. Cooper,* 868 F.2d 1505, 1514 (6th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 2440, 104 L.Ed.2d 996 (1989); *United States v. Nusraty,* 867 F.2d 759, 763 (2d Cir.1989); *United States v. Saviano,* 843 F.2d 1280, 1294 (10th Cir.), *cert. denied,* 488 U.S. 836, 109 S.Ct. 99, 102 L.Ed.2d 74 (1988); *United States v. Morgan,* 835 F.2d 79, 82 (5th Cir.1987); *United States v. Crockett,* 813 F.2d 1310, 1316 (4th Cir.), *cert. denied,* 484 U.S. 834, 108 S.Ct. 112, 98 L.Ed.2d 71 (1987); *United States v. Alvarez,* 755 F.2d 830, 853 (11th Cir.), *cert. denied,* 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985).[8]

---

**7.** It is unclear from the defendants' post-verdict motions whether they are arguing that an element of a § 846 conspiracy is specific intent to join the conspiracy or specific intent to further the object of the conspiracy.

**8.** Defendants rely upon language in the decision by the United States Court of Appeals for the District of Columbia Circuit in *United States v. Tarantino,* 846 F.2d 1384, 1392 (D.C.Cir.), *cert.*

denied, 488 U.S. 867, 109 S.Ct. 174, 102 L.Ed.2d 143 (1988), in arguing that a conspiracy in violation of 21 U.S.C. § 846 is a specific intent crime; such reliance is misplaced. Nowhere in its opinion in *Tarantino* does the Court of Appeals squarely address the elements of a § 846 conspiracy. The language the defendants rely upon in *Tarantino* is found in a discussion by the Court of Appeals on what the government needs

Accordingly, the Court committed no error in omitting specific intent as an element of § 846 conspiracy.

Moreover, the Court committed no error in categorizing a § 846 conspiracy as a general intent crime. Categorization of a § 846 crime logically and correctly follows from the use by various federal appellate courts of the terms "knowingly" and "voluntarily" in defining the level of scienter required to join a § 846 conspiracy. *See United States v. Bailey*, 444 U.S. 394, 405, 100 S.Ct. 624, 632, 62 L.Ed.2d 575 (1980) ("In a general sense, 'purpose' corresponds loosely with the common-law concept of specific intent while 'knowledge' corresponds loosely with the concept of general intent."); *United States v. Haldeman*, 559 F.2d 31, 114 n. 226 (D.C.Cir.1976) ("[A] person who knowingly commits an act which the law makes a crime may be said to have general intent, while the person who commits the same act with bad purpose either to disobey or disregard the law may be said to have specific intent."), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Holloway v. McElroy*,

632 F.2d 605, 618 n. 26 (5th Cir.1980) ("By 'general intent' we mean intent in the sense that a person intends the consequences of his voluntary actions.... The contrasting term is 'specific criminal intent,' which refers to a state of mind that is thought culpable."), *cert. denied*, 451 U.S. 1028, 101 S.Ct. 3019, 69 L.Ed.2d 398 (1981); *accord United States v. Mongiello*, 442 F.Supp. 835 (E.D.Pa.1977) ("It is well recognized that when a statute uses the word 'knowingly' the essential element is knowledge; whereas if the word 'willfully' appears in the statute, specific intent must be proved beyond a reasonable doubt in order to obtain a conviction.").

■ Even assuming, for the sake of argument, that a § 846 conspiracy is a specific intent crime, the Court's refusal to instruct the jury on specific intent constituted "harmless error beyond a reasonable doubt," *Rose v. Clark*, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), and there was no "fundamental miscarriage of justice," *United States v. Frady*, 456 U.S. 152, 172, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1982).[9] "The distinction between spe-

to prove in order to establish a single conspiracy. In that discussion, the Court of Appeals stated that "[a] single conspiracy is proven if the evidence establishes that each conspirator had the specific intent to further the common unlawful objective of the conspiracy." *Id.* In support of that statement, the Court of Appeals relies upon a case involving a conspiracy in violation of 18 U.S.C. § 371. Reliance on cases involving conspiracies in violation of 18 U.S.C. § 371 in defining the elements of a conspiracy in violation of 21 U.S.C. § 846 is not instructive because "the special purpose of the Controlled Substances Act supports the notion that Congress was legislating a distinct definition of conspiracy in § 846." *United States v. Pumphrey*, 831 F.2d 307, 309 (D.C.Cir.1987) (holding that an overt act is not an element of a § 846 conspiracy unlike a § 371 conspiracy).

9. On January 9, 1990, this Court gave counsel for the government and the Trial II defendants a pretrial order and various attachments which included the jury instructions the Court gave in the first trial; all Trial I defendants approved the conspiracy instruction contained therein. The Court's pretrial order, in pertinent part, provided that:

[C]ounsel shall advise the Court, in writing, by 4:00 p.m. on January 17, 1990 as to whether they have any objections to the Court's specification in the attached charge and ver-

dict form of the elements of the various offenses to be tried. *The failure to file such a pleading with respect to the elements of the offenses shall be deemed a waiver of any claimed defect with respect to the elements of the offenses to be tried.*

Pretrial Order (filed July 9, 1990) at 10 (emphasis added). Neither the nine defense lawyers representing the defendants nor counsel for the government filed a pleading objecting to the Court's instructions on the elements of conspiracy. As such, the Court arguably could apply a "plain error" analysis in evaluating its conspiracy instructions, which is the standard to be applied where a proper objection has not been made. Fed.R.Civ.P. 52(b). For an unobjected-to error to be plain error the "neglected error must rise to a level far above that required to survive Rule 52(a)'s ban against reversals for harmless error." *United States v. Blackwell*, 694 F.2d 1325, 1341 (D.C.Cir.1982). Despite the defendants' failure to object to the Court's specification of the elements of conspiracy in a timely manner, various defense lawyers requested the Court to include specific intent as an element of the offense of conspiracy during the Court's conference with counsel on jury instructions just before and after it delivered its charge to the jury. Therefore, the Court will give the defendants the benefit of the doubt and apply a harmless error analysis.

cific and general intent tends to confuse juries. Because of this, failure to give a separate instruction on specific intent is not reversible error so long as the Court's general instructions on intent define the appropriate mental state." *United States v. Brown*, 739 F.2d 1136, 1143 (7th Cir.), *cert. denied*, 469 U.S. 933, 105 S.Ct. 331, 83 L.Ed.2d 268 (1984); *see also United States v. Arambasich*, 597 F.2d 609, 611 (7th Cir. 1979) (upholding conviction for conspiracy to extort despite trial court's refusal to give a specific intent instruction because the trial court instructed on the requisite intent and the "labels 'specific intent' and 'general intent' are not enlightening to juries"); *United States v. Gregg*, 612 F.2d 43, 50 (2d Cir.1979) ("Although the charge given by the district court did not include in haec verba the words 'specific intent,' we hold that the charge, read in its entirety, *Henderson v. Kibbe*, 431 U.S. 145, 152, 97 S.Ct. 1730, 1735–36, 52 L.Ed.2d 203 (1977), was sufficient to instruct the jury on the *mens rea* necessary for conviction."); Devitt & Blackmar, *Federal Jury Practice and Instructions*, § 14.03, at 248 (1990 Supp.) ("Distinctions between 'specific' and 'general' intent more than likely confuse rather than enlighten juries."). *Cf. Liparota v. United States*, 471 U.S. 419, 433 n. 16, 105 S.Ct. 2084, 2092–93 n. 16, 85 L.Ed.2d 434 (1985) ("A more useful instruction might relate specifically to the mental state required ... and eschew use of difficult legal concepts like 'specific intent' and 'general intent.' ").

"To establish specific intent the government must prove that the defendants knowingly did an act which the law forbids ... *purposely intending to violate the law*. [In other words,] the accused must have known ... only that he [or she] was acting wrongly or violating the law in general when he [or she] acted." *Haldeman*, 559 F.2d at 114 n. 226 (emphasis in the original). Even though the Court's conspiracy instructions did not contain the words of art "specific intent," the jury was instructed that a defendant must have understood that his or her actions were wrong or in violation of law before the jury could find that the government proved beyond a reasonable doubt that a defendant was a member of the charged conspiracy. Specifically, the Court instructed the jury in relevant part:

> The essence of the offense of conspiracy is an agreement or understanding to violate the law.
>
> . . . . .
>
> ... A conspiracy is a combination of two or more persons to accomplish an unlawful purpose, or a lawful purpose by unlawful means. It is sometimes described as a partnership in crime. While a conspiracy involves an *agreement to break the law*, it is not necessary that the persons charged have met together and entered into an express or formal agreement, or that they have stated in words or writing what the scheme was or how it was to be effected. It is sufficient to prove that they came to a *mutual understanding to accomplish an unlawful purpose or a lawful purpose by unlawful means.*
>
> . . . . .
>
> It is necessary, however, that the Government prove beyond a reasonable doubt that a defendant was aware of

Finally, it should be noted that defendants claim that the objectionable language contained in the Court's charge was not included in the Court's charge to the jury in the first trial. This additional language consists of only two sentences which label conspiracy and the offense of distribution as general intent crimes, and state that as to these crimes if "it is shown that a person has knowingly committed an act which the law makes a crime, intent may be inferred from doing the act." Court's Jury Instructions at 30. The Court's categorization of conspiracy as a general intent crime is discussed *supra*. Because the Trial II defendants did not object to the "knowingly committed" instruction until they filed their post-verdict motions, the Court will apply a plain error analysis to the use of that instruction and finds that plain error was not committed by the use of that instruction even if a § 846 conspiracy is a specific intent crime. *See Haldeman*, 559 F.2d at 116 (holding that trial court did not commit plain error by including in its instructions on a § 371 conspiracy that "[y]ou may infer that a person ordinarily intends the natural and probable consequences of acts knowingly done or knowingly omitted").

*the common purpose of the conspiracy*—here the distribution of and the possession of with the intent to distribute cocaine or cocaine base—and that a defendant was a knowing and voluntary participant in the conspiracy. *Thus, if a defendant, with an understanding of the unlawful character of the conspiracy, knowingly, encourages, advises or assists in furthering the purpose of the conspiracy, that defendant is a knowing and voluntary participant.*

Ladies and Gentlemen, you should also note that mere knowledge or acquiescence, without participation, in the unlawful plan is not sufficient.... What is necessary is that the defendant must have *voluntarily participated in the conspiracy with knowledge of at least some of the purposes or objectives of the conspiracy.*

*Jury Instructions* at 27 (emphasis added).

The Court's brief reference to conspiracy as a general intent crime—even assuming that was erroneous—does not undermine the Court's instructions that a defendant must have understood that the objectives of the conspiracy were unlawful before he or she could have become a knowing and voluntary member of the conspiracy.

"In considering the correctness and adequacy of a charge to the jury, it should be taken as a whole and read in its entirety; that is, each instruction must be considered in connection with the others of the series referring to the same subject and connected therewith, and if, when taken together, they properly express the law as applicable to the particular case, there is no just ground for complaint, even though an isolated detached clause is in itself inaccurate, ambiguous, incomplete, or otherwise subject to criticism."

*United States v. Hathaway,* 798 F.2d 902, 912 (6th Cir.1986) (quoting *Nolan v. Greene,* 383 F.2d 814, 816 (6th Cir.1967)); *see also Brown,* 739 F.2d at 1143 (affirming conviction for § 371 conspiracy and holding that "[a]lthough the court's definition of 'knowingly' [in conspiracy instruction] told the jury that someone may act knowingly without intending to violate a law, we must not read that definition in isolation"); *Haldeman,* 559 F.2d at 114 ("instructions are to be reviewed as a whole on appeal"). The Court devoted at least three pages of its instructions on conspiracy to explaining to the jury that a defendant cannot be a knowing and voluntary member of a conspiracy unless or until the government proves beyond a reasonable doubt that he or she understood the unlawful nature of the conspiracy's objectives. The import of those three pages was not undermined by the Court's passing reference in two sentences to conspiracy as a general intent crime. Moreover, after making this passing reference, the Court reinforced its earlier instructions on conspiracy by telling the jury that "[a]s I told you a moment ago, the intent required for the offense of conspiracy is that the defendant 'knowingly and voluntarily' joined the conspiracy." *Jury Instructions* at 31. Accordingly, the Court concludes that its instructions on conspiracy, when reviewed as a whole, "fairly and adequately communicated to the jury the elements of the ... offense the government was required to prove beyond a reasonable doubt." *United States v. Fournier,* 861 F.2d 148, 150 (7th Cir.1988).

Finally, as to some defendants, the evidence is overwhelming that they *knew* they were engaging in illegal conduct; several examples of their attempts to hide their activities from law enforcement officials immediately come to mind. Sometime in 1987, Officer Jerome Sitek of the Metropolitan Police Department and two other officers were patrolling the area of 407 M Street, N.E. They observed four individuals in a dark-colored Mercedes–Benz in front of the house at that address. One of them, the defendant Columbus Daniels, exited the Mercedes and ran from the area. The other three subjects were detained for questioning, one of whom was Johnny Monford, a coconspirator convicted in the first trial. Inside the Mercedes, the officers recovered $9,000 in cash.

Aware that their phones might be wiretapped, several defendants were very wary of what they said over the telephone and of

which telephones they used. For example, the defendant Constance Perry, who expressed concern that her phone and those of many families members were being tapped,[10] called Rayful Edmond, III from her office where she was not afraid the phone lines were being tapped.[11] The defendant Rachelle Edmond told her brother Rayful Edmond, III not to call her on a portable phone because portable phones are as "hot as firecrackers."[12] Out of fear that her phone was being tapped, Rachelle Edmond had her phone number changed on more than one occasion.[13] When she called Kathy Sellers to pick up cocaine that was ready to be delivered to "the Strip" for sale, the defendant Raynice Thompson carefully chose her words so as not to utter the word cocaine or a frequently used code word for cocaine over the telephone. Instead, she would tell Kathy Sellers that "I am ready for you" or that "I have something for you." *Trial Transcript* (March 6, 1990) at 114. On one occasion, Raynice Thompson telephoned Kathy Sellers to tell her that George Derricott would be "dropping the package off." *Id.* at 142.

Rather than have Kathy Sellers pick up cocaine from their apartment at Oak Crest Towers, Raynice and Jeffrey Thompson would sometimes meet Sellers at night near a junior high school. Because a junior high school is deserted in the evening hours, they were easily able to conceal their transactions from public scrutiny. *Id.* at 137.

During a grand jury investigation of which they were aware, some defendants expressed concern that they would be questioned, that their homes would be searched, or that their financial transactions would be scrutinized. In a conversation with Alta Rae Zanville, the defendant Rachelle Edmond told Zanville what she would say if law enforcement officials questioned her about Rayful Edmond, III.[14] She also told Zanville that it would be a good idea to destroy anything that she had with "other people names on it," and that she had "burn[ed] every damn thing."[15] In addition, Rachelle Edmond told Zanville that she was going to bring any papers that she had not burned to the home of Jerry Millington's eighty-five year old aunt because no one would go to see her. Rachelle Edmond also told Zanville that "I stopped even writing checks for my bills. I started getting money orders and tearing the receipts up."[16]

Rachelle Edmond was not the only one who feared that law enforcement officers would find incriminating evidence in her home. The defendant Raynice Thompson had a similar fear, which caused her to stop holding cocaine at her home.[17] The defen-

---

**10.** In a consensual tape recording (Government's Exhibit 422A), the defendant Constance Perry said: "He don't want to be talking. We think all them lines might be tapped."

**11.** When Alta Rae Zanville asked the defendant Constance Perry what Rayful Edmond, III thought of David McCraw stealing cocaine, Perry told Zanville in a consensually recorded conversation (Government's Exhibit 428A) that "I called him at work where I can talk on the phone."

**12.** Government's Exhibit 417A.

**13.** Rachelle: *Right and they taping all the long distance calls and all of that—*

. . . . .

Rachelle: I been changing my number, cause all these people from out of town ... I don't know how they got my number ... call here ... Rayful there? I said don't no Rayful live here ... they would call Jerry late, Rayful stay here ... look, I don't know no Rayful ...
Rae: Because, yeah, I know that, you all just changed that number, cause....

Rachelle: It gone be changed again tomorrow, Rae.
Government's Exhibit 417H at 3.

**14.** Government's Exhibit 417H at 18.

**15.** *Id.* at 8.

**16.** *Id.* at 31.

**17.** In a consensually recorded conversation between Constance Perry and Alta Rae Zanville, Perry told Zanville:
Had all the outside people. And see, that's ... that's why he got that charge, he wanted to be hustling ... I remember, see, I remember when Raynice was holding, you know, was holding the stuff ... two of them and then she got rid of it cause she said, you know, she didn't want everybody running through her house and everything. And I can understand that.
Government's Exhibit 428B at 41. At trial, Zanville testified that in the context of this conversation "stuff" meant cocaine. It should also be

dant Constance Perry went to great pains to make sure her financial transactions did not look suspicious. Even when Perry had extra money, she paid off the same amount of her debt to the Internal Revenue Service each month because, as she said, "when you start paying off a whole lotta things, first thing they wanta know...."[18]

### B. *Prosecutorial Misconduct*

█ Defendants challenge certain remarks made by the prosecutor in his closing and rebuttal argument which they claim contained references to facts not in evidence and demeaned the defendants and their counsel. Although the prosecutor did make several improper statements during his rebuttal argument, the Court concludes that these statements did not substantially prejudice the defendants. *See United States v. North*, 910 F.2d 843, 895 (D.C.Cir. 1990) (explaining that "[w]hen an objection is timely made, such remarks, while improper, are cause for reversal only if they 'sufficiently prejudiced' the defendant").

In evaluating whether a prosecutor's closing remarks "sufficiently prejudiced" a defendant, the Court must consider three factors: " 'the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error.' " *Id.* (quoting *United States v. Fowler*, 608 F.2d 2, 12 (D.C.Cir. 1979)). Put another way, the Court must examine "the severity of the prosecutor's misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks." *Id.* (citing *United States v. Perholtz*, 842 F.2d 343, 361 (D.C.Cir.), *cert. denied*, 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988); *United States v. Monaghan*, 741 F.2d 1434, 1440 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1085, 105 S.Ct. 1847, 85 L.Ed.2d 146 (1985)).

### 1. *Magnitude of Prosecutorial Misconduct and of Potential Prejudice*

### a. *Reference to Facts Not in Evidence*

█ "[I]t has been established that a prosecutor should not make 'statements of fact to the jury not supported by proper evidence introduced during trial.' " *Perholtz*, 842 F.2d at 360 (quoting *Gaither v. United States*, 413 F.2d 1061, 1079 (D.C. Cir.1969)). However, the United States Court of Appeals for the District of Columbia Circuit "[l]ike other courts of appeal, ... have traditionally been chary of reversing convictions solely on the grounds of a misstatement in a closing argument." [19] *North*, 910 F.2d at 897. A prosecutor's misstatement of the evidence—standing alone—does not entitle a defendant to a new trial; such an extraordinary result is reached only when the misstatements caused a defendant "substantial prejudice." *Monaghan*, 741 F.2d at 1443. In other words, it must be highly likely "that a new trial would result in a different verdict." *Id.*; see also *North*, 910 F.2d at 897 (explaining that "while a verdict of not guilty on Count 10 would not have been irrational, ... it appears virtually certain that the jury would have convicted North on this Count in the absence of the prosecutor's reference to the size of their profits").

During his closing argument, the prosecutor told the jury that "this is, indeed, a sad occasion when you have a history of a family that ... has been dealing in narcotics in Washington, D.C. on a scale larger than anything that we have heard about in the history of this particular city." *Trial Transcript* (March 29, 1990) at 22–12. Although the evidence at trial did not compare the quantity of cocaine linked to the criminal enterprise headed by Rayful Edmond, III with that of similar criminal enterprises in the District of Columbia, the prosecutor's reference to this quantity was

---

noted that after Raynice and Jeffrey Thompson moved from Oak Crest Towers and before they stopped holding cocaine in their home, they would deliver cocaine to Kathy Sellers in a parking lot so she would not be seen picking up cocaine from their new home. Trial Transcript (March 6, 1990) at 137.

**18.** Government's Exhibit 427E at 30.

**19.** In over twenty years the United States Court of Appeals for the District of Columbia Circuit has not reversed a criminal conviction on the ground that the prosecutor misstated the evidence in his or her closing remarks to a jury. *North*, 910 F.2d at 898.

"fairly suggested by the evidence [and] by matters of common knowledge outside the evidence." *United States v. Johns*, 734 F.2d 657, 663 (11th Cir.1984); *see also Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir. 1985) (explaining that a prosecutor can draw reasonable inferences from the evidence in argument), *cert. denied*, 478 U.S. 1021, 106 S.Ct. 3336, 92 L.Ed.2d 741 (1986); *United States v. Swafford*, 766 F.2d 426, 428 (10th Cir.1985) (same).

The defendants also claim that the prosecutor misstated the evidence five times in his rebuttal argument. Two of the alleged misstatements pertain to the prosecutor's remarks about George Derricott. The prosecutor, in pertinent part, stated:

> Counsel also had Mr. George Derricott—of course, Mr. George Derricott is back again today—Mr. George Derricott has not been arrested, Mr. George Derricott that brought the drugs to Kathy Sellers at the urging of Raynice Thompson, why wasn't he in the Indictment?
>
> But recall that one individual whose name that delivered drugs to Mr. Melvin Stewart, remember what the officer said when he left the stand, the very last thing he said when Mr. Rosen asked him a question, "Well, where is the warrant?" He said, "It is being applied for right now, and I am going to get it."
>
> Well, you know there are certain investigations that don't necessarily end because you are targeting certain other people, and you still target those people, and maybe Mr. Derricott's name wasn't in the indictment for a specific reason, maybe. It wasn't because he is a gambler, but maybe his name is not in the Indictment for another reason that the government chose not to disclose, the same as Mr. Stacey Lanier, that the government may have not chosen.

*Trial Transcript* (March 20, 1990) at 23–22.

■ The Court need not even address whether the prosecutor's remarks with respect to Derricott caused the defendants prejudice because these remarks also "did not refer to facts not in evidence; [they] merely invited the jury to draw a permissible inference from the evidence which had been admitted." *United States v. Praetorius*, 622 F.2d 1054, 1059 (2d Cir.1979), *cert. denied*, 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980). Moreover, counsel for the defendant Raynice Thompson invited the prosecutor's remarks about Derricott when she stated in her closing argument that Derricott would be sitting with the defendants rather than in the spectator section of the courtroom if he really had delivered cocaine to Kathy Sellers at Raynice Thompson's direction. *Trial Transcript* (March 29, 1990) at 22–239. Counsel for Constance Perry also invited the prosecutor's remarks about Derricott when he told the jury, "[w]ell apparently they had a George Derricott case, and that dropped in a black hole too.... If George Derricott is out there doing his own thing, then bring a charge against him and start up another conspiracy." *Id.* at 22–186. The prosecutor's remarks "did no more than respond substantially in order to right the scale." *United States v. Young*, 470 U.S. 1, 12–13, 105 S.Ct. 1038, 1045, 84 L.Ed.2d 1 (1985).

The prosecutor's remarks with respect to Derricott were not the only ones which were prompted by the closing arguments of defense counsel. To bolster the credibility of two government witnesses—Kathy Sellers and Alta Rae Zanville—the prosecutor told the jury in his rebuttal that if these two witnesses had been "scripted," they "would have done a better job, because there were certainly many more names than they named." *Trial Transcript* (March 30, 1990) at 23–15. In addition, he told the jury that the government did not learn of Raynice and Jeffrey Thompson's involvement in the conspiracy until after the arrest of Sellers and Zanville. *Id.* at 23–20. The propriety of these two remarks cannot be reviewed in a vacuum. "In order to make an appropriate assessment [of whether a prosecutor's remarks were unfairly prejudicial to a defendant], the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." *Young*, 470 U.S. at 12, 105 S.Ct. at 1045.

The prosecutor's remarks about Sellers and Zanville were clearly invited by remarks that counsel for the defendant Raynice Thompson made which attacked the credibility of Sellers and Zanville based on facts not in evidence. Counsel for Raynice Thompson told the jury:

So what is the government left with? Their case, their direct evidence is left with two women, both of whom sat up on the stand as scared rabbits. Who can forget the look in that poor young girl's eyes? She had eyeballs on her that were big as saucers. She reminded me of a doe in the forest with a shotgun—some hunter with a shotgun in its face. And it is not our shotgun. It's the government's shotgun that is on Kathy Sellers. And that woman, that young scared woman sat up there and regurgitated everything that she had been spoon fed by the government.

*Trial Transcript* (March 29, 1990) at 22–232. In light of defense counsel's direct attacks alleging that the witnesses' testimony was the product of coaching and intimidation and was not credible, the prosecutor's statements, while not to be condoned, do not rise to the level of reversible error. *United States v. Saenz,* 747 F.2d 930, 941 (5th Cir.1984), *cert. denied,* 473 U.S. 906, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985).

■ Defendants also claim that the prosecutor erred when he alluded to information contained in a report prepared by Detective John Robinson after he interviewed the government witness James Minor on November 17, 1988 because the report was not in evidence. The prosecutor's remarks with respect to the report were as follows:

Robert Hardy's claim is that there was a report that was written by an officer, and during the course of writing that report, the officer didn't write down the number of other times that Mr. Minor had said that Mr. Hardy [also known as "Fila Rob"] had—that drugs were delivered to Mr. Hardy, because he tried to confine the officer, as you might recall, to a specific date, so that it would not come out and you would not hear from the officer of the other occasions that drugs had been delivered to Fila–Rob in the Bates Street area.

*Trial Transcript* (March 30, 1990) at 23–10. The defendant Hardy claims that the remarks the prosecutor made about Detective Robinson's report prejudiced him because they confirmed the testimony of Minor, one of the key government witnesses against Hardy, that he had delivered cocaine to a person named Fila Rob on occasions other than August 16, 1988. The prosecutor's reference to the report, Hardy maintains, constituted a significant blow to his attempts to impeach Minor's testimony.

The defendant Hardy overestimates the prejudice that he could have suffered as a result of the prosecutor's reference to Detective Robinson's report. First, the syntax of the statements the prosecutor made with respect to the report is convoluted at best; it was not at all clear to the Court—and therefore presumably to the jury—that the prosecutor was stating that the report would confirm Minor's testimony that he had delivered cocaine to Fila Rob on more than one occasion. Based on the direct examination of Detective Robinson by Hardy's counsel, the prosecutor simply could have been saying that Detective Robinson did not tell the jurors about the other times Minor delivered cocaine to Fila Rob, about which Minor testified at trial, because Hardy's counsel scrupulously limited Detective Robinson's direct testimony to a small portion of a report of one debriefing session of many involving Minor.[20]

---

**20.** The attempts by Hardy's counsel to carefully circumscribe the testimony of Detective Robinson is apparent in the following exchange between Hardy's counsel, the witness, and then Assistant United States Attorney Barry Tapp:

Q Did Mr. Minor tell you that after he met with Mr. Tony Lewis at 1st and Bates Street, he dropped off to Tony Lewis, meaning had gone somewhere with him in a car and then took him back to another location at 1st and Bates?

A *There came a time when Mr. Minor later told me—*

Q *No, I mean—what he said in the report.* Let me strike that question. Did Mr. Minor state that on the day that he—

Mr. Tapp: Objection. He is leading the witness.

Even assuming, for the sake of argument, that the prosecutor unequivocally stated that Detective Robinson's report would confirm that Minor delivered cocaine to Fila Rob on numerous occasions, such a statement, while improper, would not have substantially prejudiced the defendant Hardy because "it appears virtually certain that the jury would have convicted [Hardy] on the [conspiracy] count in the absence of the prosecutor's reference" to the report. *North*, 910 F.2d at 897. Hardy was seen with Rayful Edmond, III and Tony Lewis, identified by numerous witnesses at trial, and mentioned several times in the course of a consensually recorded conversation between the defendant Rachelle Edmond and Alta Rae Zanville. Moreover, James Minor gave detailed testimony about his delivery of cocaine to Robert Hardy on numerous occasions. In addition, Alta Rae Zanville testified that in April 1988 in Tony Lewis' apartment Robert Hardy and Rayful Edmond, III helped her load her suitcase with close to two million dollars, which she later brought to California as payment for a shipment of cocaine.

### b. *Attacks on Defense Counsel and Defendants*

 In responding to what he perceived to be misstatements made by defense counsel in their closing arguments, the prosecutor rhetorically asked throughout his rebuttal whether these alleged misstatements were "innocent errors" on the part of defense counsel or "intentional acts." Clearly, the prosecutor did not exercise his best judgment in relying upon this rhetorical device. "[T]he prosecutor's obligation to desist from the use of ... inflammatory rhetoric is every bit as solemn as his obligation to bring the guilty to account." *United States v. Rodriguez–Estrada*, 877 F.2d 153, 159 (1st Cir.1989).

> [However] [t]hese attacks on defense counsel fall well short of those that required reversal in *United States v. Mc-Donald*, 620 F.2d 559 (5th Cir.1980) (prosecutor implied that defendant's lawyer helped destroy evidence) or *Bruno v. Rushen*, 721 F.2d 1193 (9th Cir.1983),

cert. denied sub nom. McCarthy v. Bruno, 469 U.S. 920, 105 S.Ct. 302, 83 L.Ed.2d 236 (1984) (prosecutor suggested that defendant's hiring counsel proved his guilt and that all criminal defense counsel lie and distort facts). They are roughly comparable to statements by the prosecutor in *United States v. Livingston*, 816 F.2d 184 (5th Cir.1987), to the effect that defendants' counsel "had tried to 'disguise' the truth and create doubt where none existed." *Id.* at 195. *United States v. Goff*, 847 F.2d 149, 162–63 (5th Cir.1988) (holding that defendants were not substantially prejudiced by the prosecutor's stating in rebuttal that "[e]very lawyer that has spoken to you from the defense side has taken things out of context. They have ... cut off what they want[ed] to cut off and told you what they want[ed] you to hear and in some cases flat out misstated what the evidence was"), *cert. denied*, 488 U.S. 932, 109 S.Ct. 324, 102 L.Ed.2d 341 (1988).

Moreover, "the prosecutor's oratory was counterbalanced to a great extent by equally fiery—equally improper—rhetoric employed by defense counsel." *Rodriguez–Estrada*, 877 F.2d at 159. For instance, one defense lawyer accused the government of holding a shotgun to the heads of certain government witnesses, *Trial Transcript* (March 29, 1990) at 22–231, and another defense lawyer referred to one of the prosecutors as "Mr. Tooth Fairy," *id.* at 23–19. Although "two wrongs do not make a right, ... it strikes a less jarring note when the pot proposes to call the kettle black." *Rodriguez–Estrada*, 877 F.2d at 158.

 Finally, the defendants argue that the prosecutor portrayed them as "subhuman" and "unworthy of the jury's respect" when he told the jury that "if you stay on track of this crack in the forest, you will inevitably come to a clearing where you can see the entire herd, including all the defendants, grazing on their profits." *Trial Transcript* (March 30, 1990) at 23–19. That the prosecutor's comparison of defendants to a "herd" was improper "is so clear

Trial Transcript (March 22, 1990) at 17–160 (emphasis added).

as not to brook serious discussion." *Rod-riguez–Estrada,* 877 F.2d at 158. However, "[t]o suspect that the [one brief comparison of defendants to a herd] swayed the jury on a critical issue would underestimate the common sense that we properly attribute to the jury." *North,* 910 F.2d at 895 (refusing to reverse defendant's conviction on the ground that the prosecutor compared the defendant to Adolf Hitler in his closing argument). It also should be noted that the Supreme Court has held that a defendant was not deprived of a fair trial when the prosecutor's comparison of the defendant to an animal was far more graphic and vivid than the comparison in this case. *See Darden v. Wainwright,* 477 U.S. 168, 180 n. 12, 106 S.Ct. 2464, 2471 n. 12, 91 L.Ed.2d 144 (1986) (holding that defendant was not denied a fair trial where the prosecutor argued that the defendant was " 'an animal' " and that " '[h]e shouldn't be let out of his cell unless he has a leash on him and a prison guard at the other end of the leash.... I wish I could see him sitting here with no face, blown away by a shotgun.' ").[21]

### 2. *Curative Measures*

 The Court gave no specific curative instruction in response to the prosecutor's allegedly improper statements made during his closing and rebuttal argument.

After the government's completion of its rebuttal argument and the Court's delivery of the bulk of its charge to the jury, the government tendered to the Court a proposed curative instruction in response to various defendants' complaints about improprieties committed by the prosecutor in his closing and rebuttal arguments. When defense counsel heard the government's proposed instruction, defense counsel advised the Court that they needed to consult over whether such an instruction would be desirable; the Court gave defense counsel an opportunity to confer over the luncheon recess. After the luncheon recess, several defense lawyers objected to the Court giving a curative instruction, and no defense lawyer specifically requested a curative instruction at that time.[22] *Monaghan,* 741 F.2d at 1143 (explaining that in reviewing what, if any, corrective measure a trial court took in response to improper argument by a prosecutor, the failure of defense counsel to request a curative instruction is a relevant consideration).

Although the Court honored the request of several defense lawyers that a curative instruction not be given, the Court clearly and on numerous occasions communicated to the jury that the statements of counsel have no evidentiary value. Prior to counsel's opening statements, the Court in-

---

**21.** Defendants' reliance on *United States v. Doe,* 903 F.2d 16 (D.C.Cir.1990), in arguing that they are entitled to a new trial on the ground that the prosecutor likened them to a "herd" is misplaced. In *Doe,* the United States Court of Appeals for the District of Columbia Circuit held that "the prosecutor's discourse on the activities of Jamaican drug dealers and the accompanying tie-in with appellants," *id.* at 27, was an error of constitutional dimension because the discourse appealed to *racial* passion and was not harmless beyond a reasonable doubt, *id.* at 28. The government only has the burden of proving that an error was harmless beyond a reasonable doubt when, as in *Doe,* it commits an error of constitutional dimension. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Where the government commits an error in its closing argument which is not of constitutional dimension, as is the case here, *the defendant* has the burden of demonstrating that the error substantially prejudiced him or her. *See North,* 910 F.2d at 897 (denying defendant's motion for a new trial based on

prosecutorial misconduct because the defendant did "not make out any of the components of substantial prejudice resulting from the prosecutor's closing argument").

**22.** The failure of any defense lawyer to disagree with the objections by various defense lawyers to a curative instruction signified to the Court that no defense lawyer desired such an instruction. Throughout the trial, the Court and counsel followed a procedure whereby if one defense lawyer made an oral objection or motion, the Court presumed that all other defense lawyers wished to join in that objection or motion unless a defense lawyer expressly indicated to the contrary. *See* Court's Pretrial Order (filed January 9, 1990) at 4. Although counsel for the defendant Hardy advised the Court before the luncheon recess that he wanted to tender a curative instruction, he tendered no such instruction after the luncheon recess nor did he make an affirmative request for such an instruction when several defense counsel voiced an objection to a curative instruction.

structed the jury in its preliminary statement that "the first step in the trial process begins with opening statements" by counsel, and that "opening statements by the lawyers on both sides are not evidence in the case ... opening statements are designed to give you a map, if you will, an overall plan, as to what they expect to establish by the evidence." *Trial Transcript* (February 28, 1990) at 1–35. Later in its preliminary instructions, in telling the jury about closing arguments, the Court instructed the jury that "these statements by the lawyers in closing arguments or in their summations, just as in the case of their opening statements, are not evidence in the case." *Id.* at 1–36. Just prior to the commencement of closing arguments, the Court again instructed the jury that "the statements and arguments of counsel are not evidence, but listen carefully to all of them because they, if properly given, are designed to assist you in finding out what the facts are." *Trial Transcript* (March 29, 1990) at 22–6. In its final instructions to the jury, the Court again repeated its admonition to the jury that the statements of counsel are not evidence in the case. *See Jury Instructions* at 8. In addition, the Court instructed the jury that "[i]f any reference by the Court or by counsel in questions or argument to matters of evidence does not coincide with your own recollection of the evidence, it is your recollection that controls in your deliberations regarding the facts." *Id.* at 6.[23]

In short, although the prosecutor made several statements in his closing and rebuttal that " 'le[ft] a sour taste, [they] did not irretrievably poison the well.' The outcome of the trial was unaffected." *Rodriguez–Estrada*, 877 F.2d at 159 (quoting *United States v. Mejia–Lozano*, 829 F.2d 268, 274 (1st Cir.1987)). Accordingly, the

defendants' motion for a new trial on the ground of prosecutorial misconduct during closing and rebuttal argument will be denied.

### C. *Anonymous and Sequestered Jury*

Defendants argue that they were deprived of their Sixth Amendment right to a trial by a fair and impartial jury because of the jury's anonymity and sequestration. The Court's use of an anonymous and sequestered jury has been the subject of several opinions written by this Court. *See United States v. Perry*, Criminal No. 89–0162 (D.D.C. June 8, 1990) (denying the defendant Constance Perry's motion for a mistrial on the ground that the anonymous and sequestered jury prejudiced her and citing empirical evidence that the anonymous and sequestered jury does not necessarily work to a defendant's detriment);[24] *United States v. Edmond*, 730 F.Supp. 1144 (D.D.C.1990) (explaining reasons for making jurors anonymous and sequestered in the second trial); *United States v. Edmond*, 718 F.Supp. 109 (D.D.C.1989) (setting forth reasons for making jurors anonymous and sequestered in the first trial). Rather than repeat the Court's previous statements in its earlier opinions on the use of an anonymous and sequestered jury, the Court will only address two of the defendants' arguments. The first argument is that there were no mishaps during the trial which would have justified the Court's use of an anonymous and sequestered jury, and the second is that the prejudice caused by the jurors' anonymity and sequestration became apparent when the jury reached a verdict in approximately four and one-half hours.

■■■ The defendant's argument that the Court's decision to make the jurors anony-

---

**23.** The Court also instructed the jury similarly during the course of the trial.

**24.** In addition to the empirical evidence cited in that opinion, it should also be noted that in two out of the three trials arising out of the Superseding Indictment in the above-captioned case an anonymous and sequestered jury did not convict a defendant of all of the offenses with which he was charged. In the first trial an anonymous and sequestered jury acquitted the

defendant James Antonio Jones of the offense of possessing with the intent to distribute a quantity of cocaine, and in the third trial the defendant Columbus Daniels was acquitted of first-degree murder. The fact that there were acquittals in the first and third trials is concrete evidence that anonymous and sequestered juries can render fair and impartial verdicts, without prejudice to the defendants or the government.

mous and sequestered was unjustified because nothing untoward happened during the trial misses the mark. To allow for anonymous and sequestered juries only in trials where untoward events have occurred would "prove the adage of the futility of locking the barn door after the horse escaped." *United States v. Barnes*, 604 F.2d 121, 137 (2d Cir.1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). Moreover, the defendant Columbus Daniels' attempts to intimidate and harass witnesses who the government intended to call against him at his subsequent trial on charges of first-degree murder and carrying a pistol without a license, which were severed from his conspiracy trial, indicate a strong likelihood that he would have tried to tamper with the jurors if he had access to their names and addresses.[25]

■■■ "There is no established rule that any specified time is required to reach unanimity." *United States v. Anderson*, 561 F.2d 1301, 1303 (9th Cir.), *cert. denied*, 434 U.S. 943, 98 S.Ct. 438, 54 L.Ed.2d 304 (1977). Defendants' argument that the jury reached a verdict too quickly to have rendered a fair and impartial verdict is "a two-edged sword. The jury may have thought there was not even a shadow of doubt as to guilt." *Id.; see also United States v. Young*, 301 F.2d 298 (6th Cir. 1962) (upholding a verdict reached in four minutes); *United States v. Rebhuhn*, 109 F.2d 512, 516 (2d Cir.) (upholding trial court's denial of defendants' motion for a new trial, filed on the ground that the jury took less than three hours to reach a verdict, because the jury "needed less time than the time they actually took for reasonably sagacious men and women to see ex-

actly what the defendants had been doing, and how transparent was the pretence that they [claimed as a defense]; it would have impugned their intelligence had they hesitated longer"), *cert. denied*, 310 U.S. 629, 60 S.Ct. 976, 84 L.Ed. 1399 (1940); *Bolden v. United States*, 69 F.2d 121, 123 (D.C.Cir. 1934) ("The evidence was of such a conclusive character that there was little occasion for deliberation on the part of the jury. Certainly it may not be said that there was an abuse of discretion by the trial judge in denying the motion for a new trial."); *United States v. Richard*, 209 F.Supp. 542, 546 (D.R.I.1962) ("It is the evidence and not the time required by a jury to reach a verdict that is controlling in the consideration of a motion for a new trial.... The jury was not called upon to spend time discussing matters upon which they were in agreement."), *aff'd*, 315 F.2d 331 (1st Cir.1963); *see generally*, Annotation, "Effect on Verdict in Criminal Case of Haste or Shortness of Time in Which Jury Reached It," 91 A.L.R.2d 1238 (1963) ("Surprisingly, no criminal case has been found in which haste or shortness of time taken by a jury in arriving at its verdict was held to amount to reversible error.").[26]

#### D. *Denial of Motion for Change of Venue*

■■■ Defendants maintain that the Court's denial of their motion for change of venue also deprived them of their Sixth Amendment right to a trial by a fair and impartial jury because the overwhelming majority of the jurors in the venire was exposed to pretrial publicity surrounding the case. A juror's exposure to pretrial publicity, however, does not automatically

---

**25.** At least one witness—Robert Stewart, Rayful Edmond, III's half brother—refused to testify against Columbus Daniels at his first-degree murder trial as a result of a telephone call that he received from the defendant Columbus Daniels after he had received the government's list of prospective witnesses. Another government witness, Theodore Smith, who at the time of Daniels' trial had unrelated first-degree murder charges pending against him, was approached in the District of Columbia Jail by an inmate—Joe Sweat—who showed him two letters, one from James Antonio Jones, a convicted coconspirator, and the other from a person named

Valarea, that asked him to tell Smith, on behalf of Daniels and Jones, not to testify at Daniels' trial. Although these two letters were not shown to the jury at Columbus Daniels' trial, they were marked as Government's Exhibits 39 and 40, and they are attached hereto and incorporated by reference herein as Exhibits A and B.

**26.** This A.L.R. annotation was updated in 1979 and in 1990; neither of these updates reflect that new cases have changed the accuracy of this proposition.

preclude him or her from being a fair and impartial juror because "[t]o be 'indifferent' a juror need not be ignorant." *Haldeman*, 559 F.2d at 60.

In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion of the guilt or innocence of an accused without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.*

*Id.* (quoting *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) (emphasis in original)); *see also Patton v. Yount*, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2890–91, 81 L.Ed.2d 847 (1984) (holding that the pertinent inquiry is whether the jurors "had such fixed opinions that they could not judge impartially the guilt of the defendant"); *United States v. Angiulo*, 897 F.2d 1169, (1st Cir.1990) ("To meet the standards of the sixth amendment and due process, however, it is not mandated that each and every juror's mind be a blank slate with respect to the defendant."); *Bertolotti v. Dugger*, 883 F.2d 1503, 1521 (11th Cir.1989) ("[I]f jurors can lay aside preconceptions and base their verdict on evidence adduced at trial, they need not be completely unaware of the facts of a given case."), *cert. denied,* —— U.S. ——, 110 S.Ct. 3296, 111 L.Ed.2d 804 (1990).

"*Irvin,* establishes 'a common-sense standard' of juror qualification." *Haldeman*, 559 F.2d at 60. As a general rule, a defendant must demonstrate that he or she was *actually* prejudiced by pretrial publicity; such a demonstration is ordinarily made by reference to the *voir dire* process. *Id.* However, in "relatively rare" instances, *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49

L.Ed.2d 683 (1976), and in " 'extreme circumstances,' " *Haldeman*, 559 F.2d at 60, prejudice may be presumed. *See United States v. Mercer*, 853 F.2d 630, 633 (8th Cir.) (explaining that "the presumed prejudice principle is rarely applicable"), *cert. denied*, 488 U.S. 996, 109 S.Ct. 566, 102 L.Ed.2d 591 (1988). "To justify a presumption of prejudice under this standard, the publicity must be both extensive *and* sensational in nature. If the media coverage is factual as opposed to inflammatory and sensational, this undermines any claim for a presumption of prejudice." *Angiulo*, 897 F.2d at 1181 (emphasis in original).

While the publicity surrounding this case has been extensive, it has been largely factual in nature and a far cry from "the emotionally charged, inflammatory, sensationalistic coverage needed to support a presumption of prejudice." *Id.; compare Rideau v. State of Louisiana*, 373 U.S. 723, 727, 83 S.Ct. 1417, 1419–20, 10 L.Ed.2d 663 (1963) (finding a presumption of prejudice where the overwhelming number of people in defendant's community "saw and heard, not once, but three times [on television], a 'trial' of [the defendant] in jail, presided over by a sheriff, where there was no lawyer to advise [the defendant] of his right to stand mute") *with Stroble v. California*, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952) (holding that pretrial accounts of the defendant's case, including the prosecutor's release of defendant's recorded confession which was later received into evidence at trial, were not so inflammatory as to have constituted a denial of due process) and *Haldeman*, 559 F.2d at 61–62 (holding that trial court's denial of defendants' motion for change of venue did not constitute a denial of due process where, despite some pretrial publicity being "hostile in tone and accusatory in nature [,] [t]he overwhelming bulk ... consist[ed] of straightforward, unemotional factual accounts").

Defendants have not provided any evidence of actual prejudice other than the fact that most members of the venire had been exposed to pretrial publicity; this alone is not enough. The Court employed exhaustive procedures to screen potential

**1140**

jurors and to empanel a fair and impartial jury, including having the jurors answer a comprehensive written questionnaire and respond to oral questions about, among other things, what they had seen or heard about the case, whether they knew any of the parties involved in the case, and their attitudes towards drugs and the crime situation in the District of Columbia. The jurors' responses to these oral and written questions "demonstrate that the jurors who were ultimately seated could base [their] decision on the evidence presented. Thus, the impartiality of the jury is adequately supported by the record." *Mercer,* 853 F.2d at 633. "In addition, the fact that [the defendants] failed to use all of their allotted peremptory challenges indicates the absence of juror prejudice." *United States v. Alvarez,* 755 F.2d 830, 859 (11th Cir.) (citing *United States v. Gorel,* 622 F.2d 100, 103–04 (5th Cir.1979)), *cert. denied,* 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985).[27]

### E. Verdict Form

■ The Court employed a verdict form which did not ask the jurors to indicate whether the defendants were "guilty" or "not guilty" of the crimes with which they were charged. Instead, the verdict form asked the jurors to indicate whether the government had proved beyond a reasonable doubt the elements of the crimes with which the defendants were charged by checking "yes" or "no" at the appropriate places on the verdict form.[28] Defendants claim that they are entitled to a new trial because the format of the verdict form "infringed upon the jury's option to acquit for whatever reason, even though they might be satisfied that the elements of

each offense was [sic] proven."[29] In other words, the verdict form, the defendants argue, had the effect of foreclosing the jury from engaging in jury nullification.

A defendant does not have a right to have the Court "inform [a] jury of its inherent power to acquit notwithstanding a defendant's factual guilt," *United States v. Washington,* 705 F.2d 489, 494 (D.C.Cir. 1983), nor may counsel argue jury nullification in closing argument, *United States v. Trujillo,* 714 F.2d 102, 106 (11th Cir.1983). In fact, "[s]ince the Supreme Court's decision in *Sparf and Hansen v. United States,* 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895), federal courts have uniformly recognized the right and the duty of the judge to instruct the jury on the law and the jury's obligation to apply the law to the facts, and that nullification instructions should not be allowed." *United States v. Drefke,* 707 F.2d 978, 982 (8th Cir.), *cert. denied,* 464 U.S. 942, 104 S.Ct. 359, 78 L.Ed.2d 321 (1983). The Court has the responsibility to remind the jurors of their oath or affirmation to apply the law, as the Court gives it to them, to the facts because, as the United States Court of Appeals for the District of Columbia Circuit has held, verdicts based on jury nullification "are lawless, a denial of due process and constitute an exercise of erroneously seized power." *Washington,* 705 F.2d at 494. "A jury has no more '*right*' to find a 'guilty' defendant 'not guilty' than it has to find a 'not guilty' defendant 'guilty,' and the fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law." *Id.* (emphasis in original).

---

**27.** Four of the twenty-one peremptory challenges allotted to the defendants for the twelve jurors and six alternates were not used.

**28.** For example, the verdict form as to Count 1, in pertinent part, provided:

**Count 1**

We, the Jury, unanimously find, as to the defendants listed below, that the Government has proved beyond a reasonable doubt, each element of the offense of conspiracy to distribute or to possess with the intent to distribute more than 5

kilograms of a mixture or substance containing a detectable amount of cocaine or more than 50 grams of a mixture or substance containing a detectable amount of cocaine base in violation of Title 21, U.S.Code sections 841(a), 841(b)(1)(A)(ii)-(II), 841(b)(1)(A)(iii), and 846.

\_\_ Yes WILLIE G. CHILDRESS \_\_ No
\_\_ Yes COLUMBUS DANIELS \_\_ No
 (also known as "Little Nut")
. . .

**29.** Rachelle Edmond's Motion for Judgment of Acquittal, n.o.v. and/or for New Trial at ¶ 39.

The verdict form employed by the Court was consistent with the Court's duty to remind the jury of its obligation to reach a verdict based on an application of the law to the evidence seen and heard in the courtroom during the trial and not based on extraneous influences. In fact, this type of verdict form makes it more likely that a jury will not wrongfully convict a defendant by overlooking an element of the charged offenses. Accordingly, the defendants' complaints about the verdict form are lacking in merit.

F. *Willie Childress' Motion for Prior Approval of Expenditure of Criminal Justice Act Funds for an Optometrist to Testify in His Case*

The defendant Willie Childress contends that he is entitled to a new trial because the Court did not grant his motion seeking prior approval of the expenditure of Criminal Justice Act funds for Dr. Norman Wong, an optometrist from California, to testify in his case.[30] The defendant Childress maintains that this testimony was essential to rebut the government's contention that he was not the older gentlemen with a beard and glasses from whom James Minor received two boxes containing fifty kilograms of cocaine at the Day's Inn in Crystal City, Virginia in August 1988. The essence of Dr. Wong's testimony allegedly would have been that the defendant Childress did not wear prescription eyeglasses in August 1988. The Court disagrees that the defendant Childress is entitled to a new trial on this basis because he was primarily responsible for his inability to call Dr. Wong, and, in any event, Dr. Wong's absence at trial did not prejudice him.

The day after the defendant Childress filed a motion requesting the Court to approve the expenses associated with calling Dr. Wong as a witness, the defendant withdrew his motion. *Trial Transcript* (March 22, 1990) at 17–72. At the time the defendant Childress withdrew his motion, he advised the Court that he was looking instead for an optometrist from the District of Columbia area who could testify in his case. *Id.* Five days later and a little over two hours before he was to present his case to the jury, the defendant Childress renewed his request for the approval of Dr. Wong's expenses because he was unable to find an optometrist in the District of Columbia area who could testify in his case, other than one who would provide testimony by telephone. *Trial Transcript* (March 27, 1990) at 20–127. The government, with justification, would not agree to the cross-examination of defendant's witness by telephone. The defendant Childress should have been aware that the Court could not grant his eleventh-hour request to renew his motion without calling the trial to a complete halt to accommodate him. The prejudice, if any, to the defendant Childress' case was solely a result of his failure to secure—over a five-day period—the in-court testimony of a local optometrist as he had represented he would to the Court.

In any event, the defendant Childress' claim that he was prejudiced by his inability to call an optometrist is lacking in merit. Even without the testimony of Dr. Wong, there was evidence before the jury that Minor was unable to identify the defendant Childress as the person from whom he received the two boxes of cocaine or to describe him with any particularity.[31] At trial, Minor was unable to identify the defendant Childress in the courtroom as the person from whom he received the two boxes of cocaine. In addition, a stipulation of fact was read to the jury that when James Minor was shown a photograph of the defendant Childress on January 26, 1989, he was unable to identify the person in the photograph. *Id.* at 20–238. Moreover, the defendant Childress called as a witness his sister Audrey Bobby who testified that she had never seen her brother wear prescrip-

---

**30.** Dr. Wong is the defendant Childress' optometrist in California.

**31.** Minor testified that "[w]hen you are doing that type of thing, you try to move as fast as possible. You are not going to sit there and stare somebody down." *Trial Transcript* (March 8, 1990) at 135.

tion or sun glasses.[32] *Id.* at 20–235. Finally, the defendant Childress introduced into evidence his driver's license which did not reflect any restriction for corrective lenses. Accordingly, the defendant Childress was not prejudiced by the Court's ruling and is not entitled to a new trial on this basis.[33]

The Court will issue an Order of even date herewith in accordance with the foregoing Opinion.

### ORDER

In accordance with the Court's Opinion of even date herewith, it is, by the Court, this 20th day of August, 1990,

ORDERED that the defendants' motions for judgment of acquittal shall be, and hereby are, DENIED, with the exception of the defendant Ronald Morgan's motion for judgment of acquittal on Count One of the redacted Superseding Indictment; and it is

FURTHER ORDERED that the defendant Ronald Morgan's motion for judgment of acquittal on Count One of the redacted Superseding Indictment charging him with a conspiracy to violate the narcotics laws of the United States in violation of 21 U.S.C. § 846 shall be, and hereby is, GRANTED; however, the defendant Morgan's conviction on Count Five charging him with possessing with the intent to distribute 500 or more grams of a controlled substance shall stand; and it is

FURTHER ORDERED that otherwise the defendants' motions for judgment of acquittal and/or a new trial shall be, and hereby are, DENIED.

---

**32.** Pursuant to the Criminal Justice Act, the Court authorized the expenditure of funds for the expenses associated with Audrey Bobby's trip from California to Washington, D.C. as well the expenses of another witness who the defendant Childress never called to testify.

**33.** The foregoing recitation of evidence favorable to the defendant Childress is by no means inconsistent with the Court's denial of his motion for judgment of acquittal based on insufficiency of evidence. *See supra* p. 1125. Regardless of the weight the jury gave to Minor's testimony that he received two boxes containing fifty kilograms of cocaine from a man wearing glasses, there was substantial independent circumstantial evidence upon which a rational jury could have concluded that the defendant Childress was the person from whom Minor received the cocaine. The defendant David McCraw greeted the supplier of the cocaine by saying "Hey, *Captain*, what's happening." Trial Transcript (March 8, 1990) at 134 (*emphasis added*). There was enough circumstantial evidence at trial for a rational jury to have made a factual finding that "Captain" was the defendant Childress' nickname. Sergeant John Joseph Bickers of the Missouri Highway Patrol testified that the defendant Childress had told him that "Cap" was his nickname. In addition, in the same time frame as the Day's Inn incident, in a *telephone conversation between the defendants* Rayful Edmond, III and Tony Lewis, Lewis asked Edmond who the two persons in an "old van" were. Edmond responded "[t]hat's *Captain Willie.*" Government's Exhibit 376A. Lewis' inquiry about the two persons in the old van also corroborated the following testimony by Minor: "And the guy comes out—he's got somebody with him, and goes in his van, and he gives us a U–Haul—two U–Haul boxes that were in there." Trial Transcript (March 8, 1990) at 135. Finally, records from the Day's Inn Hotel which indicated that the defendant Childress was staying there around the time Minor received the *two boxes of cocaine at the Day's Inn* were received into evidence.

Exhibit A

Whats happening Joe,
 I am up here In North 2ᵈ with the good young
brother. you dig!
 Things are still the same with
me you know, these hot (Motherfuckers) cannt
stop a good man from doing what he got to do
you know Joe!
 you know, that fat Motherfucker In
61-cell I think he is the one that had me
moved you dig, Because his name keep coming
up In little Nuts case, saying that he was
down the (go go) the night that dude got
Killed, I am not just saying this is what I
think, because this is what I know nut shows
me his wittness list and fat Boys name is Smith
and he's on there to testify against little nut
and Rayful. I saw It with my own eyes and
thats law, you know.
 Let Valarea know what I
said, and every one else know about that hot
fat Bitch.

 Let Rick & JD. know whats up.
and tell my Women I Love them all,

 also tell BO. and calton I send my regards!
( I got Tony doing a 1,000 push up a day "HA, HA")

 Later,
 Tonio

GOVERNMENT EXHIBIT 39

Hi Joe
I' Just talk to Nut And Tonio. The dude in 61st is telling on Nut in Court. They want you to say something to him at once cause Nut go to court tomorrow and I don't know what the rest of the story is.

He is the dude that got Tonio mane cause he is afraid of him.

Your woman is a trip she need to be cool. Please don't tell her what is up. They said say something to him now

Love you
Valann

